Errol **BROWN, et al., Plaintiffs,**

v.

The **UNITED STATES, Defendant.**

No. 91–898L.

United States Court of Federal Claims.

Dec. 28, 1994.

**510**

Edward M. Ranger, Scottsdale, AZ, attorney of record for plaintiffs.

Glen R. Goodsell, Washington, DC, with whom was Asst. Atty. Gen. Lois J. Schiffer, for defendant.

---

## OPINION

REGINALD W. GIBSON, Judge:

### INTRODUCTION

This matter comes before the United States Court of Federal Claims on defendant's Motion to Dismiss or in the Alternative for Summary Judgment, as well as Plaintiffs' Cross–Motion for Partial Summary Judgment. Plaintiffs, certain Indian owners of allotted land on the Salt River Reservation, seek money damages from the United States for breach of a fiduciary duty based on an alleged trust relationship between them and the government arguably stemming from authority implicit in 25 U.S.C. § 415(a) and related regulations 25 C.F.R. Part 162. Conversely, defendant's motion for summary judgment challenges the threshold jurisdiction of this court to even hear plaintiffs' claim. The thrust of defendant's argument is that plaintiffs' claim does not rest upon any money-mandating provision of law or a contract with the United States as required under the Tucker Act, 28 U.S.C. § 1491. Defendant also moves to dismiss the complaint for lack of subject matter jurisdiction (RCFC 12(b)(1)), asserting that it is barred by the six-year statute of limitations contained in 28 U.S.C. § 2501 (1988),[1]

---

1. Section 2501 states, in relevant part, that "[e]very claim of which the United States [Court of

Federal Claims] has jurisdiction shall be barred

and for failure to join a necessary and indispensable party (RCFC 19). Because we conclude that plaintiffs' fail to point to any source of statutory law or regulations which can be fairly interpreted as mandating compensation, we find that jurisdiction over this matter pursuant to 28 U.S.C. § 1491 is wanting. Accordingly, defendant's Motion for Summary Judgment[2] must be granted.

## FACTS

The 14 named plaintiffs at bar are Indians, members of the Salt River Pima–Maricopa Indian Community near Phoenix, Arizona. Most of the irrigated land in the reservation was divided into 10 acre parcels and allotted to individual Tribe members pursuant to the General Allotment Act, 25 U.S.C. § 331 *et seq.* (1988). Many of these allottees have sought to lease their land for commercial purposes pursuant to 25 U.S.C. § 415 (1988).[3] Thus, on June 1, 1964, plaintiffs (or their predecessors in interest), along with other allottees, as lessors, entered into a lease with Stovers, Inc., a Nebraska corporation, as lessee. The collective 160–acre property was leased to Stovers for 25 years for the purpose of operating a golf course, presently named Pima Country Club.

The lease, known as "Lease B–45," provided that the lessee would pay lessors a ground rental in quarterly installments in addition to quarterly payments equal to a percentage of the gross receipts from business conducted on the premises, including greens fees, membership fees, cart rentals, driving range fees, and pro shop sales. The lease called for quarterly payments of two percent (2%) of gross receipts starting July 1, 1966, and four percent (4%) of gross receipts beginning July

1, 1968. To ensure that lessors received the payments due, the lease provided that a certified public accountant licensed in Arizona, appointed by the lessee, would submit to lessors and the Secretary of the Interior a certified quarterly statement of gross receipts.

On September 21, 1971, after several years of apparently smooth lease operations, attorneys for York State Bank informed the Bureau of Indian Affairs, Salt River Agency ("the BIA"), that lessee's mortgage on the lease was in default for failure to make interest payments. As a consequence of this event, the Agency and Virgil Brown, spokesman for the lessors,[4] agreed that the matter required the diligent attention of lessors in their effort to achieve a fair return on the property. However, no evidence suggests that any action was taken, at that time, by plaintiffs or the BIA.

Less than a year later, on March 8, 1972, Knutson Companies, Inc. acquired the golf resort. Shortly thereafter, Knutson, as the new owner, submitted a proposal to the BIA to extend the lease term, among other things. Discussions over the proposed lease amendments continued for several years with no resolution. In 1975, at the Tribe's request, the BIA began contracting its Realty Management Program, in addition to other services, to the Tribe. Under these contracts,[5] the Tribe was responsible for managing and administering leases on the reservation.

In 1979, after the golf resort was renamed "Pima Inn and Golf Resort, Inc." ("Pima Inn") and Lawrence G. Malanfant, a new investor, began to acquire a controlling inter-

---

unless petition thereon is filed within six years after such claim first accrues."

2. The defendant styles its motion as one for summary judgment pursuant to RCFC 56. However, to the extent that a challenge of this court's basic jurisdiction is contained therein, we shall treat that motion as a motion to dismiss for lack of subject matter jurisdiction, under RCFC 12(b)(1). See *Oglala Sioux Tribe of the Pine Ridge Reservation v. United States,* 21 Cl.Ct. 176, 178, n. 3 (1990).

3. Section 415 provides, in pertinent part, "Any restricted Indian lands, whether tribally or indi-

vidually owned, may be leased by the Indian owners, *with the approval* of the Secretary of the Interior ..." (emphasis added).

4. Virgil Brown calls himself spokesman for lessors in correspondence beginning February 5, 1975, and continuing through September 12, 1986, when he and other allottees signed a letter to a representative. In a May 13, 1987 letter, Brown says he was "elected" spokesman for "lessees" [*sic*].

5. These contracts are called "638" contracts because they are entered into by the BIA pursuant to Pub.L. No. 93–638, 88 Stat. 2203 (1975).

est in the property, Brown sought advice and assistance. On September 16, 1979, on behalf of the lessors, Brown signed a limited power of attorney with Warren "Smitty" Smith. While the extent of Smith's duties remains unclear, the limited power of attorney authorized him to appoint an accountant to conduct an audit. During this active period in the lease, Malanfant, who had been designated a director of the newly-named Pima Inn,[6] requested, on July 20, 1979, in addition to an extension on the lease, permission to make specific improvements to the resort property as well the right to assign the property's interest to a bank or institutional lender in case of default.

Approximately two months later, in connection with the ongoing negotiations, Brown requested that Pima Inn deliver to plaintiffs certified financial statements of gross receipts for 1977 and 1978, as required under the lease. Pima Inn, through a letter by its counsel, agreed to comply with Brown's request "in a good faith effort to maintain an amiable working relationship with the lessors."

Negotiations regarding modified lease terms continued over the next six years. In October and November of 1986, plaintiffs, via Brown, wrote to the BIA requesting copies of current certified accounting statements. After obtaining such financial statements from the lessee, the BIA sent copies to the lessors. Upon evaluating the financial report, and concluding that it was insufficient, Brown, on May 13, 1987, authorized Robert O. Rose, a certified public accountant, to conduct an audit.

Rose performed the audit and concluded in his report on May 29, 1987, that lessee, now known as Pima Country Club, Inc., had not disclosed the full extent of its gross receipts generated from membership fees and dues. Rather, he alleged, the lessee had discounted these amounts by 40%, and reported only 60% to the lessors. Rose's audit stated that the gross receipts, under the lease, should

have included 100% of the membership fees and dues. Brown communicated the results of the audit to the BIA in a December 10, 1987 letter.

Over the next several years, the BIA, the Tribe, and the lessors collectively launched an investigation into the administration of the lease. The BIA ultimately concluded on May 15, 1990, that, as a result of it breaches of the lease agreement, lessee was precluded from exercising its option to renew the lease. This determination was made pursuant to a lease provision that allowed the BIA to initiate a termination action. Pima Country Club appealed to the Interior Board of Indian Appeals, which, in its October 24, 1991 opinion, agreed with the BIA's determination (*Pima Country Club v. BIA,* IBIA 90–109–A).

Plaintiffs' complaint, filed in the predecessor Claims Court on February 7, 1991, alleges that, as a direct and proximate result of the United States Government's breach of fiduciary duties, plaintiffs suffered damages in lost rents and profits under the lease and in their continued inability to obtain the value of the current "highest and best" use of the leased premises.

## CROSS–MOTIONS FOR SUMMARY JUDGMENT

### I. CONTENTIONS OF THE PARTIES

#### A. *Defendant*

The United States moves, in one of its motions, for summary judgment alleging that plaintiffs have failed to comply with the jurisdictional requirements of the Tucker Act, 28 U.S.C. § 1491, in that they have not pointed to a constitutional provision, statute, regulation, or executive order mandating that monetary compensation be paid to it by the federal government.[7] Without a substantive provision of law mandating payment, defendant asserts, plaintiffs cannot recover damages in this court from the federal govern-

---

6. A June 19, 1981 letter shows Malanfant's title to be "President" of Pima Inn and Golf Resort. Furthermore, a July 2, 1980 letter states that the Resort had been under the direction and management of Malanfant for several years.

7. See note 2, *supra.*

ment.[8] Defendant acknowledges that a mandate for the payment of compensation may be implicit within a statute, regulation, or executive order when a fiduciary relationship is found to exist between plaintiffs and the United States. However, the government contends that, while statutes and regulations can in certain cases create a fiduciary duty in the United States, the statute(s) and regulation(s) at issue in this case do not create a fiduciary relationship between plaintiff-Indians and the government because they do not impose comprehensive management responsibilities upon the government. Rather, defendant argues, the relationship between plaintiffs and the United States in this matter is best characterized as a "limited trust." The government further avers that statutes and regulations giving rise to a "limited trust," as opposed to a full fiduciary relationship, may not be fairly read to mandate monetary compensation. Thus, defendant concludes, since only a "limited trust" is present in this case, there is no law requiring the United States to compensate plaintiffs. Therefore, the United States contends that it is entitled to the grant of its motion.

### B. *Plaintiffs*

In opposition to defendant's motion, plaintiffs argue that the United States may be held liable when it breaches its fiduciary duties with regard to its responsibilities in managing allotted lands. Moreover, they contend that the statutes and regulations, at issue, in this matter clearly give the government comprehensive and elaborate control over leases on allotted lands on the Salt River Reservation. *See* 25 U.S.C. § 415 (1988); 25 C.F.R. Part 162 (1994). As a result, plaintiffs maintain, Congress has imposed full fiduciary responsibilities on the United States Government. Thus, the Indian landowners assert that they have properly presented a claim for damages arising from the government's breach of its trust obligations. In conclusion, they submit that the government has breached its fiduciary duties owed to them and that they are entitled to compensation from the government. Accord-

ingly, they maintain, defendant's motion must be denied.

Secondly, plaintiffs move, on the same basis, for partial summary judgment in their favor on the issue of the existence of a general fiduciary relationship between the government and plaintiff-Indians. Because, they argue, the legal statutory and regulatory scheme governing commercial leases on allotted lands vests pervasive authority and control in the Secretary of the Interior, that scheme should be read to impose general fiduciary duties on the government. *See* 25 U.S.C. § 415; 25 C.F.R. Part 162. Furthermore, plaintiffs contend that a damages remedy for breach of those obligations naturally follows from the existence of a fiduciary relationship. Therefore, the Indian landowners conclude that they may properly sue the government based on the existence of a general trust relationship between them and the United States in regard to commercial leases on their allotted lands. Accordingly, and against this background, plaintiffs request that this court grant their motion for partial summary judgment, finding that the United States has assumed general trust obligations over their leasing activity.

## II. DISCUSSION

### A. *Introduction*

■ The Court of Federal Claims' core jurisdiction is delineated by the Tucker Act, 28 U.S.C. § 1491, which embraces that:

any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States.

The courts have construed this jurisdictional statute narrowly, holding that § 1491 is only jurisdictional and does not, *ipso facto*, create a substantive right to money damages. *See United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Hanson v. United States*, 13 Cl.Ct. 519, 526 (1987). It is, therefore, clear that, in order to maintain an action in this court, other than on a contract theory, a plaintiff must show that a particular provision of law confers a right to

---

8. Nor can the court assume jurisdiction over the claim.

be paid a certain amount of money. *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1007, 178 Ct.Cl. 599 (1967); *Brown v. United States,* 3 Cl.Ct. 31, 47 (1983). The jurisdiction authorized in 28 U.S.C. § 1491, therefore, requires that a plaintiff allege that a specific statute or regulation creates either an express or an implied substantive right to receive monetary compensation for damages. In other words, in the absence of any provision of law mandating payment, the court's Tucker Act jurisdiction cannot be engaged. Hence, this court lacks jurisdiction to entertain any claim for money damages not predicated upon a money-mandating statute or regulation or other legal source or contract. Thus, on this premise, we must now resolve the question—whether the statutory and regulatory sources of law relied on by plaintiffs can fairly be read to mandate compensation for their breach. *Eastport,* 372 F.2d at 1007.

In the case at bar, no statute or regulation cited by plaintiffs creates an express right to compensation for violations of the duties contained therein. *See* 25 U.S.C. § 415; 25 C.F.R. Part 162. Indeed, the Indian landowners do not assert or point to any statute or regulation that gives them an express right to payment. Rather, they simply claim that the legal scheme governing commercial leases of allotted lands somehow gives rise to an implied right to compensation because that scheme creates a general fiduciary relationship between plaintiff-Indians and the United States. Consequently, in order to determine whether the legal provisions relied on by plaintiffs can be fairly read to mandate compensation, we must examine those sections and decide whether or not they in fact give rise to a comprehensive trust relationship and to the attendant fiduciary duties resulting therefrom. Because, and for the reasons set forth below, we find that the statutory and regulatory provisions proffered by plaintiffs as the legal basis for their claim for money damages do not impose general fiduciary duties on the government, we must hold that our Tucker Act jurisdiction has not been appropriately engaged. Therefore, since there is no proper jurisdictional basis upon which this court could entertain this action, plaintiffs' complaint must be dismissed.

**B. *Fiduciary Relationship Between the United States and the Indians***

In order to state a claim for money damages in this court, plaintiffs *must* demonstrate that "the statutes and regulations at issue in this case *clearly* establish [the] fiduciary obligations of the Government in the management and operation of Indian lands...." *United States v. Mitchell,* 463 U.S. 206, 226, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983) (*Mitchell II* ) (emphasis added). If such a "clear[ ]" fiduciary relationship is established, then the statutes and regulations may be fairly read to mandate compensation because "... it naturally follows that the Government should be liable in damages for breach of its fiduciary duties." *Id.* The Supreme Court has discussed when the government will be found to have assumed fiduciary obligations in two related cases, *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*Mitchell I* ), and *Mitchell II.*

In *Mitchell I,* the owners of allotted lands on the Quinault Indian Reservation brought suit against the United States alleging that the government had mismanaged their timber resources. The Court held that the General Allotment Act, 25 U.S.C. § 331 *et seq.,* could not be fairly read to create a fiduciary duty on the part of the government to manage Indian timber resources properly, but, rather, that it created only a "limited trust" between the United States and Indian allottees. 445 U.S. at 546, 100 S.Ct. at 1355. In reaching this conclusion, the Court was persuaded that the Act had been intended to prevent improvident alienation of Indian land and to ensure the immunity of such lands from state taxation rather than to create a general fiduciary relationship. *Id.* at 544, 100 S.Ct. at 1354. However, the Court left open the possibility that other statutes or regulations could give rise to a fiduciary relationship between the parties. *Id.* at 546, n. 7, 100 S.Ct. at 1355, n. 7. An action for money damages will lie, said the Court, if the statutes and regulations at issue *"unambiguously provide* that the United States has undertaken *full fiduciary* responsibilities"

with respect to the activities in dispute. *Id.* at 542, 100 S.Ct. at 1353 (emphasis added).

Three years later, the Supreme Court considered whether the operative statutes governing the management of timber resources and other related activities on Indian lands, 25 U.S.C. §§ 162a, 323–25, 406, 407, 413 and 466, and the related regulations promulgated thereunder, 25 C.F.R. Parts 163 and 169, imposed fiduciary obligations on the United States. *Mitchell II.* In its detailed analysis, the Court focused on the *nature and extent* of the Secretary of the Interior's explicit duties and responsibilities and the degree of control exercised by the government with respect to Indian timberlands.

There, the Court noted that the Secretary was *required* under statute to manage Indian timber resources "on the principle of sustained-yield management." 463 U.S. at 221, 103 S.Ct. at 2970. The Secretary was also *directed* to consider "the needs and best interests of the Indian owner and his heirs," taking into account:

> (1) the state of growth of the timber and the need for maintaining the productive capacity of the land for the benefit of the owner and his heirs, (2) the highest and best use of the land, including the advisability and practicality of devoting it to other uses for the benefit of the owner and his heirs, and (3) the present and future financial needs of the owner and his heirs.

*Id.* at 222, 103 S.Ct. at 2970 (citing 25 U.S.C. § 406(a)). Based on these and other noted statutory and regulatory provisions, the Court held that the United States had assumed "comprehensive responsibilities" in managing Indian forests, exercising "literally daily supervision over the harvesting and management of tribal timber." *Id.* (citing *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 145–47, 100 S.Ct. 2578, 2584–86, 65 L.Ed.2d 665 (1980)).

The *Mitchell II* Court concluded that the language of the relevant statutes and regulations "directly support[ed] the existence of a fiduciary relationship," emphasizing that these provisions called for the government to manage Indian timber resources so as to obtain the greatest revenue for the Indians, always considering the needs and best inter-ests of the Indians. *Id.* 463 U.S. at 224, 103 S.Ct. at 2971. Moreover, the Court held that "a fiduciary relationship necessarily arises when the Government assumes such elaborate control over ... property belonging to Indians." *Id.* at 225, 103 S.Ct. at 2972. As a result of this creation of a fiduciary relationship between the government and the Indians, the Court found that the statutes and regulations at issue in *Mitchell II* could be interpreted as mandating compensation for damages arising out of a violation thereof.

The Court of Appeals for the Federal Circuit reached a similar conclusion in *Pawnee v. United States,* 830 F.2d 187 (Fed.Cir.1987). There, the court held that "the United States has a general fiduciary obligation toward the Indians with respect to the management of ... oil and gas leases" because the governing statutes and regulations, like those at issue in *Mitchell II:*

> (a) give elaborate powers to Interior with respect to those leases, (b) always call for consideration of the best interest of the Indians, (c) require proceeds to be given to the Indians and, (d) recognize the existence of a general trust relationship toward the Indians with respect to the oil and gas products of these lands.

*Id.* at 190. Thus, the Court of Appeals found that the statutes and regulations governing oil and gas leases on Indian land could be fairly interpreted to mandate compensation for damages arising from a breach thereof.

■ From the foregoing precedent, we draw the conclusion that a general fiduciary obligation will arise in the United States Government when it assumes *comprehensive management responsibilities* or *elaborate control* over Indian lands or property for the purpose of furthering and maximizing the *best interests of the Indian owners.* In this light, and given the foregoing standards, we must now examine the statutes and regulations relied upon by plaintiffs in this matter to ascertain whether the United States has assumed the *full* obligations of a general fiduciary with respect to the commercial leasing of allotted Indian lands as unambiguously provided in the applicable statute and regulations. Only if such a relationship exists, at

bar, will these legal provisions be deemed to mandate the payment of money damages.

## C. *Leases on Allotted Lands*

Plaintiffs warmly allege, here at bar, that 25 U.S.C. § 415 and 25 C.F.R. Part 162, governing leases of allotted Indian land, *ipso facto,* create a general fiduciary obligation in the United States. Indian lessors further claim that the legal framework contained in these sections is indistinguishable in its comprehensiveness and in the nature of the obligations provided for therein from that at issue in *Mitchell II.* We do not concur in this hospitable assertion. Upon reviewing the applicable legal provisions cited to by plaintiffs in the context of the indisputable facts, this court must conclude that they do not impose *comprehensive management responsibilities* and/or elaborate control upon the United States Government for the purpose of furthering the *best interests* of the Indians. Accordingly, and as explicated below, we find that 25 U.S.C. § 415 *and* 25 C.F.R. Part 162 do not give rise to a general fiduciary relationship between plaintiffs and the United States.

### 1. *25 U.S.C. § 415*

■ 25 U.S.C. § 415 provides, in pertinent part, as follows:

Any restricted Indian lands, whether tribally or individually owned, may be leased by the Indian owners, with the approval of the Secretary of the Interior, ... for a term not to exceed twenty-five years ... Prior to the approval of any lease ... the Secretary of the Interior shall first satisfy himself that adequate consideration has been given to the relationship between the use of the leased lands and the use of neighboring lands; the height, quality, and safety of any structures or other facilities to be constructed on such lands; the availability of police and fire protection and other services; the availability of judicial forums for all criminal and civil causes arising on the leased lands; and the effect on the environment of the uses to which the leased lands will be subject.

A literal reading of § 415 merely *permits* the Secretary of the Interior to consider leases for approval, but does not direct him to do so. Moreover, it does not require or authorize him to *manage or administer* leases, once in force. From the plain language of the statute, the role of the Secretary is simply confined to approval and fails to contemplate any comprehensive or on-going management responsibilities. In this regard, § 415 is similar to 25 U.S.C. § 81, which requires Secretarial approval of contracts between Indians and third parties. In *Montana Bank of Circle v. United States,* 7 Cl.Ct. 601, 614 (1985), the Claims Court held that the Secretary's contract approval responsibilities under § 81 were not of comparable scope and detail to the Secretary's timber management responsibilities and that, therefore, they were "not sufficient to justify, as reasonable, the conclusion that Congress intended the United States to be liable monetarily and implicitly impose a fiduciary relationship."

Furthermore, it is worthy of note that the factors that the Secretary is directed to consider when approving leases under § 415 do *not* make reference to the best interests of the Indian owners or their financial needs. Rather, they (*i.e.,* the factors) seem more in the nature of zoning, safety, or environmental concerns, which are traditional general welfare concerns of government when acting in a non-fiduciary capacity. 25 U.S.C. § 415. By way of contrast, 25 U.S.C. § 406 (1988), at issue in *Mitchell II,* requires the Secretary to base sales of timber "upon a consideration of *the needs and best interests* of the Indian owner." § 406(a) (emphasis added). The Secretary is further directed there to maintain "the productive capacity of the land for the benefit" of the Indian owner, to consider how to obtain "the highest and best use of the land for the benefit" of the Indian owner, and to take into account "the present and future financial needs of the owner and his heirs." *Id.* Section 406 repeatedly stresses, and directs the Secretary to pursue, the benefit and best interests of the Indian owners, while § 415, relied on by plaintiffs, fails to mention the interests or needs of the Indian lessors even once.

Therefore, applying the criteria laid out in *Mitchell II,* we conclude that 25 U.S.C. § 415 does not vest comprehensive management

responsibilities or elaborate control over Indian leases of allotted lands in the Secretary of the Interior, his role being limited thereunder to the mere approval of leases. Furthermore, the Secretary is not directed, pursuant to that provision, to maximize for the Indian owners the benefit derived from the leases, nor is he instructed or directed to consider the needs or best interests of the Indian owners of allotted lands. Consequently, we find that 25 U.S.C. § 415 does not, clearly, unambiguously, or to any extent, create a full fiduciary relationship or "full fiduciary responsibilities" between the United States and plaintiffs. *Mitchell II.* If, and assuming, of course, on this record, a general fiduciary obligation has arisen in the United States with respect to leases under § 415, it will have been created by the regulations, either alone or in conjunction with the statute. Accordingly, we now turn to examine the regulations at issue on this point.

### 2. *25 C.F.R. Part 162*

■ Plaintiffs contend that under the related regulations contained in 25 C.F.R. Part 162, governing leasing on allotted Indian lands, the United States has assumed such pervasive and elaborate control over Indian lands that a fiduciary relationship has been created with respect to the leasing of those lands. Under the applicable regulations, the Secretary of the Interior must provide the form for lease agreements on allotted Indian lands and must consider leases for approval. 25 C.F.R. § 162.5(a). Pursuant to his approval responsibilities in 25 C.F.R. Part 162, the Secretary must consider subleasing and assignment provisions, § 162.12, disapprove of leases at less than fair rental, § 162.5(b), and disapprove lease terms of longer than

the minimum duration that will allow the highest economic return for the owner "consistent with prudent management and conservation practices," § 162.8. Finally, the Secretary is directed to initiate the cancellation of leases upon a showing that there has been a violation of a lease entered into under the regulations. 25 C.F.R. § 162.14.

Despite the enumeration of these responsibilities vested in the government, 25 C.F.R. Part 162 does not create a regulatory scheme with sufficiently pervasive and comprehensive authority that it clearly and unambiguously establishes full fiduciary obligations in the United States. *Mitchell I* and *Mitchell II; Wright v. United States*, 32 Fed.Cl. 54, 58 (1994); *Cherokee Nation of Okla. v. United States*, 21 Cl.Ct. 565, 578 (1990).[9] First, the role of the Secretary is almost entirely limited to the review of leases negotiated by others. *Wright*, 32 Fed.Cl. at 58. The government is not required to pursue leases on allotted lands or to seek out potential lessees. The Secretary has no responsibility to manage or administer leases once they enter into effect. Nor is he compelled to monitor lease compliance under the regulations, although he must initiate cancellation if a violation is brought to his attention. 25 C.F.R. § 162.14. Furthermore, there is no requirement that the Secretary maximize the productive capacity of the Indian lands. Part 162 does not—

> impose a duty on the Secretary to ensure that the Indian land owners get the best lease possible or the most profitable lease arrangement. Rather, the Secretary is obligated only to make sure that no lease is approved at less than the present fair annual rental. 25 C.F.R. § 162.5(b).

---

9. In *Oglala Sioux Tribe*, 21 Cl.Ct. 176, this court found that the United States had assumed such pervasive authority and elaborate control over tribal land and monies that a fiduciary relationship was created based on numerous regulations and statutes at issue in that case. Among the regulatory provisions relied on was 25 C.F.R. Part 162. However, because the court did not address whether Part 162 standing alone (or with a single statute) gives rise to the full obligations of a trustee, it is not conclusive as to the issue we consider here, *i.e.*, whether 25 U.S.C. § 415 and 25 C.F.R. Part 162 generate a fiduciary relationship. We note that in that case, the court relied on sections 2, 5, 9, 415 and 461–79 of title 25 of the U.S.Code, 25 C.F.R. Parts 150–52, 162 and 166, and several Memoranda of Understanding, prepared by the Tribe and the BIA delineating their obligations, in reaching its conclusion that a trust relationship had been established. Moreover, it is significant that in *Oglala* the court said that the regulations governing grazing lands, 25 C.F.R. Part 166, were of "paramount importance ... because the lion's share of the subject land is grazing land." *Id.* at 189. Thus, the situation facing the court in that case was significantly different from the situation at bar, requiring that we now consider whether the legal provisions at issue in this case give rise to a fiduciary relationship.

*Wright,* 32 Fed.Cl. at 58. Similarly, the Secretary is directed to disapprove of leases longer in duration than is necessary to allow the highest economic return to the Indians. Thus, the only time the Secretary is directed to consider the economic position of the Indians is in the context of disapproving leases. The Secretary is not directed to take any affirmative steps to further the economic interests of the Indian lessors. In sum, the regulations contemplate a scheme where Indian lessors enter into lease agreements and the Secretary considers these leases for approval and then does little else.

Second, the large management role is left to individual Indian landholders and Indian tribes in the regulations. 25 C.F.R. Part 162 "recognizes increasing responsibility assumed by individual Indians who lease their allotted lands." *Cherokee Nation,* 21 Cl.Ct. at 578. Individual Indian allottees alone have the power to grant leases on the lands they own, 25 C.F.R. § 162.3, and they are empowered to negotiate those leases, 25 C.F.R. § 162.6. Furthermore, Indian lessors may combine their parcels of land and enter into a single lease. 25 C.F.R. § 162.10. It is true that under certain conditions the Secretary is given a more involved role in the leasing of allotted lands. For example, he may grant leases, 25 C.F.R. § 162.2, negotiate leases, 25 C.F.R. § 162.6(c), and advertise land for lease, 25 C.F.R. § 162.7. However, these expanded powers are only exercisable, pursuant to § 162.2, on behalf of, *inter alia,* persons who are *non compos mentis,* orphaned minors, and undetermined heirs. *Cherokee Nation,* 21 Cl.Ct. at 578. Plaintiffs in this matter do not fall within the ambit of 25 C.F.R. § 162.2. Indeed, they (or their predecessors in interest) signed Lease B–45 on their own behalf. Thus, with respect to competent adult Indians, the regulations at issue in this case leave much authority and discretion with the individual allottees and, therefore, does *not* grant comprehensive responsibilities or elaborate control to the Secretary.

Plaintiffs argue that the regulations in Part 162 are identical in scope and detail to those at issue in *Mitchell II* and *Pawnee,* which were found to impose fiduciary responsibilities on defendant. A comparison of the relevant provisions will prove instructive. In contrast to Part 162, where the Secretary must disapprove leases when they provide less than fair rental under the regulations governing timber harvesting and mineral leasing, 25 C.F.R. Parts 163 and 212 (1994), the Secretary is required to conduct competitive bidding or auctions and to award contracts to the highest bidders. 25 C.F.R. § 163.7, § 212.4. Thus, under the timber and mineral regulations the Secretary has a duty to take affirmative steps to maximize the payments to the Indian landowners, which duty is not found in Part 162, relied on by plaintiffs.

Moreover, the regulations governing oil and gas leases and timber sales give the Secretary comprehensive *management* responsibilities after the lease or contract has been awarded not found in Part 162. For example, under 25 C.F.R. § 212.24, the Secretary may prescribe operating regulations for oil and gas lessees, including prescribing drilling times and production levels from wells on leased lands. Furthermore, mineral lessees are required to keep books and accounts to be inspected by the Department of the Interior. 25 C.F.R. § 212.25. Likewise, the Secretary has pervasive management responsibilities under the timber harvesting regulations. 25 C.F.R. Part 163. His objective is to maintain Indian "forest lands in perpetually productive state by providing effective management...." 25 C.F.R. § 163.3(a). He must prepare and supervise "management and operating plans" containing "the policies of the ... Secretary" to be applied to the forested lands. 25 C.F.R. § 163.4. Under § 163.7(b), the Secretary may sell timber "without the consent of the owners when in his/her judgment such action is necessary to prevent loss of values...." Further, "[t]he Secretary is responsible to control and mitigate harmful effects of insects and diseases on Indian forest lands." 25 C.F.R. § 163.24(b). Additionally, he is "authorized to maintain facilities and staff ... to meet normal wildfire protection needs and extinguish forest or range fires on Indian reservations or other Indian trust lands" and is also required to "conduct a wildfire prevention program." 25 C.F.R. § 163.21.

Under the leasing regulations contained in 25 C.F.R. Part 162, the Secretary has none of these extensive duties to administer and manage leases once in effect. The only thing the Secretary is required to do after a lease has been approved is to initiate a cancellation if a violation of a lease is shown. As the Claims Court has noted, the formula contained in Part 162 "differs drastically from the pervasive nature of the statutes and regulations governing oil, gas, and timber resources under which defendant assumes full responsibility." *Cherokee Nation,* 21 Cl.Ct. at 578. That this should be the case makes sense in light of the resource to be managed in each situation. Oil, gas, and timber are resources that are depletable in a way that land, in and of itself, is not. Therefore, more detailed and comprehensive regulations are needed to conserve these resources.

Th[is] difference is critical when examined in light of the trust corpus requirement. In *Mitchell II,* the Court found a general fiduciary obligation with respect to the management of timber resources on allotted lands. Timber assets on reservations resemble a trust corpus because they must be managed in such a way as to conserve the asset while maximizing income by allowing mature timber to be harvested and sold. The government must assume the duty of preserving the principal (timber), generating income (timber sales), and disbursing profits to individual allotment holders. The statutory scheme in *Mitchell II,* was so pervasive that even individual Indians were precluded from conducting logging operations on their own allotment.

*Grey v. United States,* 21 Cl.Ct. 285, 293 (1990).

From the foregoing analysis, we are constrained to conclude, on this record, that 25 C.F.R. Part 162 does not impose comprehensive management responsibilities on the government with respect to leases of Indian allotments. Moreover, the Secretary is not directed under Part 162 to always consider the best interests of the Indian landholders or to obtain for them the greatest revenues. Thus, we find that the marginal control of the United States over plaintiffs' lands, under the regulations, is not so elaborate or pervasive as to give rise to a general fiduciary obligation on the part of the government. Therefore, we hold that 25 C.F.R. Part 162 does not create a full fiduciary relationship between plaintiffs and the United States Government.

### 3. *Conclusion*

Having found that neither 25 U.S.C. § 415 nor 25 C.F.R. Part 162 establish that the United States has assumed the full obligations of a fiduciary with respect to leases on allotted Indian lands, we further hold that, taken together, these provisions also fail to create a general fiduciary relationship. The duties of the Secretary contained in the statute are substantially included in the regulations. Thus, considering the statute and the regulations together does not significantly change the analysis regarding whether or not a fiduciary duty has been imposed on the government. A fiduciary is "[a] person or institution who *manages* money or property for another...." *Black's Law Dictionary* 563 (5th ed. 1979) (emphasis added). Similarly, the Supreme Court in *Mitchell II* found that a fiduciary relationship was created when the government assumed comprehensive *management* responsibilities over Indian property. 463 U.S. at 221, 103 S.Ct. at 2970. The legal scheme governing the kind of leasing at issue in the case at bar does not vest significant management duties in the government. Rather, the Secretary's role is almost entirely limited to approving leases negotiated by others. *Wright,* 32 Fed.Cl. at 58. Furthermore, Indian lessors retained substantial responsibilities to manage their own affairs. Finally, the degree of control over the Indian lands authorized by the applicable legal provisions is not sufficiently elaborate or pervasive to create a fiduciary obligation in the United States. Unlike the provisions governing timber harvesting, those at issue in this matter do not require that the Secretary exercise "literally daily supervision" over Indian lands. Indeed, beyond approving leases, the Secretary is given almost no supervisory role by these provisions. Therefore, we hold that 25 U.S.C. § 415 and 25 C.F.R. Part 162 do not "unambiguously provide that the United States has undertaken full fiduciary responsibilities" with respect to the leasing activities at issue

in this case. *Mitchell I*, 445 U.S. at 542, 100 S.Ct. at 1353. In order to find that a complete trust has been established, "there must be a clear or strong showing that Congress intended to create such fiduciary duties." *Montana Bank*, 7 Cl.Ct. at 613. The legal provisions at issue here do not support such a finding.

### III. CONCLUSION

For the foregoing reasons, we hold that 25 U.S.C. § 415 and 25 C.F.R. Part 162 cannot be fairly interpreted to mandate the payment of compensation for breaches thereof. As a result, jurisdiction in this court under the Tucker Act is wanting because 28 U.S.C. § 1491 requires that a claim be founded upon a substantive legal right to money damages contained in the Constitution, a statute or regulation, or a contract. Plaintiffs have failed to properly engage the Tucker Act jurisdiction of this court. As a consequence of the foregoing, further consideration of defendant's remaining grounds for *dismissal* (*i.e.*, the statute of limitations under 28 U.S.C. § 2501, and failure to join an indispensable party pursuant to RCFC 19) is, therefore, moot. Accordingly, defendant's motion for summary judgment herein treated as a motion to dismiss is hereby GRANTED, and the complaint shall, therefore, be dismissed. The Clerk shall enter judgment accordingly. No costs.

IT IS SO ORDERED.