MICHEL, Circuit Judge.
Errol Brown et at. (Brown) appeal from the December 28, 1994 decision of the United States Court of Federal Claims dismissing their breach of trust claim against the United States for lack of subject matter jurisdiction. Brown v. United States, 32 Fed. Cl. 509 (1994). The appeal was submitted for decision after oral argument on October 2, 1995. Because we conclude that by Congress’ having placed effective control over commercial leasing of allotted lands in the Secretary of the Interior (the Secretary), which must be exercised for their benefit according to the implementing regulations, the government has assumed an enforceable fiduciary obligation to Indian allottees respecting commercial leasing, we reverse the trial court’s decision and remand the case for further proceedings.
Background
Brown is a member of the Salt River Pima-Maricopa Indian Community near Phoenix, Arizona. Most of the irrigated land in the Community’s reservation was long ago divided into 10-acre parcels and allotted to individual members of the Community under the authority of the General Allotment Act. Act of Feb. 8, 1877, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. §§ 331-34, 339, 341-42, 348-49, 354, and 381 (1994)).[1] The allotments are not grants of title to the land in fee simple, but confer only a beneficial interest in the land, legal title to which is held by the federal government in trust. 25 U.S.C. § 348. Importantly, this beneficial interest does not include the general power to lease the allotment; instead, allottees have the power to lease an allotment only for statutorily prescribed purposes and only with the prior approval of the Secretary. See 25 U.S.C. §§ 177 (general prohibition on conveyance of interest in Indian lands), 202 (criminal penalty for inducing any Indian to convey an interest not authorized by statute to be conveyed), 391-416j (permitting leases for enumerated purposes on allotted and unallotted lands); Reid P. Chambers & Monroe E. Price, Regulating Sovereignty: Secretarial Discretion and the Leasing of Indian Lands, 26 Stan. L. Rev. 1061, 1068-75 (1974) (discussing history of federal policy on leasing of Indian trust lands).
On June 1, 1964, pursuant to the leasing power extended to them by 25 U.S.C. § 415 (1964),[2] Brown and other allottees (or their predecessors in interest) collectively leased their land as a 160-acre parcel to Stovers, Inc., a Nebraska corporation, for use as a commercial golf course. The lease, known as “Lease B-45,” was executed on a form provided by the Department of the Interior’s Bureau of Indian Affairs (the Bureau). It provided that the lessee would pay the lessors a fixed ground rental in quarterly installments plus a quarterly payment equal to a percentage of the golf course’s gross receipts. In order to ensure that the lessors received the payments due them, the lease also required that a certified public accountant of the lessee’s choice submit certified quarterly statements of gross receipts to both the lessors and the Secretary. Finally, the lessees, provided they were not in default at the critical time, enjoyed an option to renew the 25-year term of the lease.
Beginning with the original lessee’s default on the lease mortgage in 1971, the lessors and the Bureau experienced a variety of difficulties keeping the 160-aere parcel productive: old lessees left and new ones arrived, attempted extensions of the lease term were negotiated to impasse, and both maintenance of various financial records and sub *1557 mission of quarterly gross receipts statements lapsed for periods of timé.[3]
In 1987, after another unsuccessful round of negotiations regarding modified lease terms with Pima Country Club, Inc., the then-current lessee, a representative of the allottees directed a certified public accountant to audit the golf course business. The accountant reported that the lessee had not disclosed the full extent of its gross receipts, discounting them by 40% and thus reporting only 60% to the lessors. Over the next several years, the Bureau, the Community, and the lessors collectively investigated the administration of the lease. In May 1990, the Bureau, acting under 25 C.F.R. § 162.14,[4] determined that the lessee’s breach of the lease agreement precluded it from exercising its option to renew the lease.
Brown filed suit in the instant case in February 1991, alleging that, as a direct result of the Secretary’s breach of the fiduciary obligation imposed on him by 25 U.S.C. § 415(a)[5] and 25 C.F.R. part 162, he suffered damages in lost rents and profits under Lease B-45 and a continued inability to realize the parcel’s potential value. Specifically, the allottees claimed that (a) the lessees mismanaged the property and failed to make payments required by the lease, and (b) the government, acting through the Bureau, breached its fiduciary duty to the allottees by failing (1) to compel the lessees to fulfill their reporting and payment responsibilities under the lease, or (2) to cancel the lease in a timely manner once the lease violations were uncovered.
The government moved for a dismissal for lack of subject matter jurisdiction, contending that neither 25 U.S.C. § 415(a) nor its implementing regulations create a fiduciary duty upon which the allottees can base a suit for damages in the Court of Federal Claims. Specifically, the government argued that no general fiduciary duty exists in the commercial leasing context because neither section 415(a) nor part 162 “impose[s] comprehensive management responsibilities upon the government.” Brown, 32 Fed.Cl. at 513. Instead, according to the government, the Secretary’s involvement in the commercial leasing of Indian lands can only be considered a “bare” or “limited” trust such as Congress created with the General Allotment Act of 1887. According to the Supreme Court’s decision in United States v. Mitchell, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (Mitchell I), allottees cannot ground a suit for damages on the bare trust created by the General Allotment Act.
The Court of Federal Claims granted the government’s motion to dismiss the case, concluding that the statute and regulations “cannot be fairly interpreted to mandate the payment of compensation for breaches thereof.” Brown, 32 Fed.Cl. at 520. Specifically, after a detañed review of the three controlling cases — Mitchell I; United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (Mitchell II); and Paw *1558 nee v. United States, 830 F.2d 187 (Fed.Cir. 1987) — the trial court described its view of the proper analytic framework for testing its jurisdiction over the breach of trust claim as follows: “a general fiduciary obligation will arise in the United States Government when it assumes comprehensive management responsibilities or elaborate control over Indian lands or property for the purpose of furthering and maximizing the best interests of the Indian owners.” Brown, 32 Fed.Cl. at 515 (emphasis in original). The trial court then assessed section 415(a) and part 162 within this framework.
Regarding section 415(a), the trial court concluded that “§ 415 merely permits the Secretary of the Interior to consider leases for approval, but does not direct him to do so,” and that the statute “does not require or authorize him to manage or administer leases, once in force.” Id. at 516 (emphasis in original). The court also found it “worthy of note” that section 415(a) does not expressly direct the Secretary to consider the best interests or financial needs of the allottees when deciding whether to approve particular leases. Id. In sum, “[f]rom the plain language of the statute, the role of the Secretary is simply confined to approval and fails to contemplate any comprehensive or ongoing management responsibilities.” Id. Regarding the regulations set forth in 25 C.F.R. part 162, the trial court concluded that “[d]espite the enumeration of [various] responsibilities [over leases] vested in the government ... [p]art 162 does not create a regulatory scheme with sufficiently pervasive and comprehensive authority that it clearly and unambiguously establishes full fiduciary obligations in the United States.” Id. at 517. “In sum,” the court observed, “the regulations contemplate a scheme where Indian lessors enter into lease agreements and the Secretary considers these leases for approval and then does little else.” Id. at 518. Finally, the trial court held that “considering the statute and the regulations together does not significantly change the analysis.” Id. at 519.
As the penultimate paragraph of the trial court’s opinion makes clear, the court’s focus throughout was on the comprehensiveness vel non of the Secretary’s role in commercial leasing under section 415(a):
The legal scheme governing the kind of leasing at issue in the case at bar does not vest significant management duties in the government. Rather, the Secretary’s role is almost entirely limited to approving leases negotiated by others. Furthermore, Indian lessors retained substantial responsibilities to manage their own affairs. Finally, the degree of control over the Indian lands authorized by the applicable legal provisions is not sufficiently elaborate or pervasive to create a fiduciary obligation in the United States. Unlike the provisions governing timber harvesting [considered in Mitchell II ], those at issue in this matter do not require that the Secretary exercise “literally daily supervision” over Indian lands. Indeed, beyond approving leases, the Secretary is given almost no supervisory role by these provisions.
Id. at 519 (citation omitted).
Brown appeals from the dismissal of his complaint, contending that the trial court erred by deriving too narrow a test for the presence of a general fiduciary duty from Mitchell II, treating the “comprehensive management” and “elaborate control” characteristic of the timber management program analyzed in Mitchell II as the minimum amount of management and control necessary to warrant the conclusion that the government has assumed an enforceable fiduciary duty to the allottees. Brown also contends that, even assuming that the trial court applied the proper test of fiduciary duty, the court erred by underestimating the degree of control over commercial leasing on Indian lands that the Secretary exercises under section 415(a) and part 162. The government contends, in response, that the trial court drew the proper lesson from the controlling cases — namely, that fiduciary “liability only comes into existence when the government actively manages the land at issue” — and applied it correctly to statute and regulations governing commercial leases. Finally, Brown replies that it is “the assumption of ‘control or supervision’ over tribal money or property by the government that gives rise to the imposition of trust *1559 standards, and ‘control or supervision’ perfectly describes the Secretary’s role with respect to commercial leasing of allotted lands.” (Quoting Mitchell II, 463 U.S. at 225, 103 S.Ct. at 2972.) For the reasons set forth below, we are persuaded of the correctness of Brown’s view of the test of fiduciary duty established in Mitchell II.
Analysis

Standard of Review

The question before us is whether the Court of Federal Claims erred in dismissing this breach of trust claim against the United States for lack of subject matter jurisdiction. We review the Court of Federal Claims’ decision to dismiss a complaint for lack of subject matter jurisdiction de novo. Shearin v. United States, 992 F.2d 1195, 1195 (Fed.Cir.1993).
The Mitchell Decisions
Brown invoked the jurisdiction of the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491, a waiver of sovereign immunity for money claims against the United States not sounding in tort. It is axiomatic that the Tucker Act “is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages.” United States v. Testan, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). A claimant must therefore demonstrate either that he or she has an “express or implied contract with the United States,” 28 U.S.C. § 1491, or that some applicable source of substantive law “ ‘can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.’” Testan, 424 U.S. at 400, 96 S.Ct. at 954 (quoting Eastport S.S. Corp. v. United States, 178 Ct.Cl. 599, 372 F.2d 1002, 1009 (1967)). This source of substantive law may grant the right to recovery either “expressly or by implication.” Eastport S.S. Corp., 372 F.2d at 1007. The Supreme Court has twice applied these principles in the context of Indian breach of trust claims. Both decisions, Mitchell I and Mitchell II, involved the same allottee claimants and the same timber management statutes and regulations.
In Mitchell I, the Supreme Court rejected the claimants’ contention that the General Allotment Act of 1887 creates a general fiduciary duty enforceable against the government by means of a claim for damages. The Court of Claims, one of our predecessor courts, had drawn the opposite conclusion from that part of the Act providing that the United States is to “hold the land thus allotted ... in trust for the sole use and benefit of the Indian to whom such allotment shall have been made.” 445 U.S. at 541, 100 S.Ct. at 1353 (quoting 25 U.S.C. § 348). According to the Supreme Court, this language, when understood in light of the Act’s legislative history, “create[s] only a limited trust relationship between the United States and the allottee[s] that does not impose any duty upon the Government to manage timber resources.” Id. at 542, 100 S.Ct. at 1353. Having concluded that the General Allotment Act could not ground the suit, the Court remanded the case for a decision on whether any of the other statutes and regulations alleged to provide an alternative basis for maintaining the damages claim against the government actually did so. Id. at 546 and n. 7, 100 S.Ct. at 1355 and n. 7.
In Mitchell II, the Supreme Court affirmed the Court of Claims’ remand decision that each of the various statutory regimes involved — timber management (25 U.S.C. §§ 406, 407, 466), roadbuilding on and granting rights-of-way over Indian lands (25 U.S.C. §§ 318, 323-25), and trust fund and fee management (25 U.S.C. §§ 162a, 413)— imposes general fiduciary duties on the government sufficient to ground a damages claim under the Tucker Act. 463 U.S. at 224, 103 S.Ct. at 2971-72. After describing all three statutory regimes in great detail, id. at 219-23,103 S.Ct. at 2969-71, the Court concluded that, “[i]n contrast to -the bare trust created by the General Allotment Act, the statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians.[6] They there *1560 by establish a fiduciary relationship and define the contours of the United States’ fiduciary responsibilities.” Id. at 224, 103 S.Ct. at 2971-72. The criterion the Court used to determine whether the statutes in question imposed fiduciary duties did not, however, set the threshold as high as “full management responsibility.” The Court’s criterion is as follows:
[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.
Id. at 225, 103 S.Ct. at 2972 (emphasis added) (quoting Navajo Tribe of Indians v. United States, 224 Ct.Cl. 171, 624 F.2d 981, 987 (1980)).[7] According to this disjunctive “control or supervision” test, nearly complete government management (i.e., “supervision”) or control, while more than sufficient to create an enforceable fiduciary duty, is not necessary. See also White Mountain Apache Tribe v. United States, 11 Cl.Ct. 614, 628 (1987) (“[Appropriations from tribal funds for irrigation projects required the approval of the Secretary of the Interior. This control of Indian funds would seem to satisfy the Supreme Court’s requirement in Mitchell [II] that a duty be based upon control of tribal monies or property.”), aff'd, 5 F.3d 1506 (Fed.Cir.1993) (table), cert. denied, — U.S.-, 114 S.Ct. 1538, 128 L.Ed.2d 191 (1994). The Court’s alternative test of “control or supervision” makes eminent good sense as well. If the Secretary controls leasing, that he or she does not also supervise or manage it should not matter. Under Mitchell II, then, as properly (and literally) construed, the assumption by Congress and/or the Secretary, its delegatee, of control of allottee money or property beyond the limited trust embodied in the General Allotment Act imposes on the government a fiduciary duty to the allottees. Of course, as the Court noted in Mitchell II, the same statutes and regulations that create these duties limit their scope by “defin[ing] the contours of the United States’ fiduciary responsibilities.” 463 U.S. at 224, 103 S.Ct. at 2972.
The Supreme Court has not decided a basic fiduciary duty question like the one now before us since Mitchell II We have done so only once, in Pawnee.[8] In Paumee, we faced the question whether the government owes Indian allottees a general fiduciary duty in connection with oil and gas leases on Indian mineral lands. The Claims Court had dismissed the plaintiffs’ complaint for lack of subject matter jurisdiction. After reviewing the relevant statutory and regulatory provisions, we concluded that
[t]his case is very much like [Mitchell II ], in that here the governing statutes and regulations (a) give elaborate powers to Interior with respect to those leases, (b) always call for consideration of the best interests of the Indians, (c) require proceeds of the leases to be given to the Indians and, (d) recognize the existence of a general trust relationship toward the Indians with respect to the oil and gas products of these lands.
*1561 Id. at 190. Because we concluded that the statutes and regulations at issue gave the Secretary duties and controls comparable to those reviewed in Mitchell II, we had no occasion in Pawnee to comment on whether a lesser degree of control would satisfy the “control or supervision” test.
Brown contends, quite correctly, that the trial court erred in the instant case by imposing a more restrictive test for the existence of a fiduciary duty than was established by Mitchell II. The Supreme Court did not qualify “control or supervision” with modifiers such as “significant,” “comprehensive,” “pervasive,” or “elaborate.” Nor did the Court anywhere suggest that the assumption of either control or supervision alone was insufficient to give rise to an enforceable fiduciary duty.
In addition, the Court stressed that its interpretation of the timber management statutes “is reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people.” Mitchell II, 463 U.S. at 225, 103 S.Ct. at 2972. We would run afoul of both the plain terms of the Court’s test and the general trust relationship that informs that test were we, like the trial court, to further restrict the “control or supervision” test by recasting it as a “comprehensive management responsibilitfy] or elaborate control” test. The government argues on appeal that, regardless of the Secretary’s control over commercial leasing, “Mitchell I, Mitchell II, and their progeny require that the government pursue an active role in the management of trust property in order to be liable for damages.”[9] The government’s approach, like the trial court’s, would have us raise the jurisdictional threshold above the level where the Supreme Court has already squarely placed it, a step we are without the power to take.
The proper test of whether the government has assumed fiduciary duties in the commercial leasing of allotted lands is thus whether, under section 415(a) and/or part 162, the Secretary, rather than the allottees, has control or supervision over the leasing program. All that remains, at this stage of the ease, is to apply the test to the statute and regulations at issue.

The Commercial Leasing Program

We begin by noting that we agree with the trial court’s conclusion that under the statute and implementing regulations now before us, unlike those analyzed in Mitchell II, the Secretary lacks ongoing management responsibility over the day-today administration of commercial leases concerning allotted lands. We thus reject Brown’s secondary contention that the case at bar presents a statutory and regulatory management regime factually comparable to the one reviewed in Mitchell II. The commercial leasing program does, however, impose an enforceable fiduciary duty on the government under the “control” portion of Mitchell II’s “control or supervision” test.
It is plain that the allottees do not control the leasing of their lands. First, they can only grant those leases of which the Secretary approves. 25 U.S.C. § 415(a); Sangre de Cristo Dev. Co. v. United States, 932 F.2d 891, 894 (10th Cir.1991) (“In order for the [section 415(a) ] lease to have been valid, the [Interior] Department’s approval was required.”) (citing terms of section 415(a)). *1562 Second, they can grant leases only on terms and forms that the Secretary dictates. 25 U.S.C. § 415(a); 25 C.F.R. § 162.5(a) (“All leases made pursuant to the regulations in this part shall be in the form approved by the Secretary____”). Third, an allottee cannot cancel a lease without the Secretary’s prior approval under 25 C.F.R. § 162.14. Yavapai-Prescott Indian Tribe v. Watt, 707 F.2d 1072, 1073, 1074 n. 4 (9th Cir.), cert. denied, 464 U.S. 1017, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983). Fourth, the Secretary can cancel a lease without the allottee-lessor’s consent. 25 C.F.R. § 162.14.
These features of section 415(a) leases must, of course, be understood against the backdrop created by 25 U.S.C. § 177, the most general prohibition on conveyances of interests in Indian lands,[10] and the express provision of the General Allotment Act, 25 U.S.C. § 348, that “if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, ... such conveyance or contract shall be absolutely null and void.” As a consequence of sections 177, 348, and 415(a), the allottees must choose either (a) to lease at the pleasure of the Secretary, according to the regulations, and on his or her terms, or (b) not to lease at all. Dispossessed of the all the conventional incidents of ownership touching the power to lease their land, the allottees thus retain nothing more than the power of a beneficiary under a trustee’s control. Such control over the entry into, terms of, and exit from leasing as the Secretary retains by virtue of section 415(a) and part 162, understood against the backdrop of section 348, is all that is required to create enforceable fiduciary duties under the “control” portion of the test established by Mitchell II.[11]
Nor may the Secretary’s power be considered a mere oversight power, inasmuch as its exercise is a necessary prerequisite to the execution of a valid and binding lease. Oversight power is an after-the-fact power to review transactions that have been negotiated and executed by others. The Secretary’s approval power over leases, by contrast, must be exercised before any valid leasing transaction can occur.
Although the statutory criteria that constrain the Secretary’s exercise of his or her approval power are, as the trial court noted, “in the nature of zoning, safety, or environmental concerns, which are the traditional general welfare concerns of government when acting in a non-fiduciary capacity,” Brown, 32 Fed. Cl. at 516, the implementing regulations include further criteria that are identical to those which traditionally constrain the discretion of a private trustee. For example, the regulations generally prohibit the Secretary from approving proposed leases “at less than the present fair annual rental.” 25 C.F.R. § 162.5(b). They also require that leases “be limited to the minimum duration ... that will allow the highest economic return to the owner [i.e., the allot-tee] consistent with prudent management and conservation practices.” 25 C.F.R. § 162.8. In addition, all section 415(a) leases must specify that “all of the lessee’s obligations under th[e] lease, and the obligations of his sureties, are to the United States as well as to the owner of the land [i.e., the allottee].” 25 C.F.R. § 162.5(g)(1). Indeed, according to section 162.5(h)(2), the Secretary has the discretion to direct that rental payments be made to the Bureau rather than to the individual allottee. The regulations thus make it clear beyond any doubt that the Secretary exercises his or her control over commercial leasing on allotted lands not only for traditional general welfare purposes, as section 415(a) alone would suggest, but also for the purpose of protecting the allottees’ financial interests. This protection of anoth *1563 er’s financial interests by the exercise of independent judgment and control is, of course, the essence of a fiduciary’s duty to the beneficial owner of a trust corpus.
In sum, by virtue of the control they place in the hands of the Secretary, section 415(a) and the implementing regulations of part 162 impose upon the government a fiduciary duty in the commercial leasing context. “Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.” Mitchell II, 463 U.S. at 226, 103 S.Ct. at 2972-73.

The Scope of the Government’s Duty

That the commercial leasing regime created for trust lands in 25 U.S.C. § 415(a) and 25 C.F.R. part 162 imposes general fiduciary duties on the government in its dealings with the Indian allottee-lessors “does not mean that any and every claim by the Indian lessor necessarily states a proper claim for breach of the trust.” Pawnee, 830 F.2d at 191. The validity of a breach of trust claim grounded on section 415(a) must be assessed according to the general principle that “[t]he scope and extent of the fiduciary relationship” alleged to have been breached “is established by the regulation[s]” that control this type of leasing. Id. at 192; see also Mitchell II, 463 U.S. at 224, 103 S.Ct. at 2971-72 (“[T]he statutes and regular tions now before us ... establish a fiduciary relationship and define the contours of the United States’ fiduciary responsibilities.’’) (emphasis added). In other words, where no specific statutory requirement or regulation is alleged to have been breached by the Secretary, the money claim against the government must fail.
As noted above, the Secretary enjoys the exclusive authority to cancel commercial leases executed under section 415(a) upon a proper investigation. 25 C.F.R. § 162.14. In the instant case, the Secretary did not cancel the lease, but simply refused to approve its renewal after it had expired. The appellants assert, inter alia, that the Secretary’s failure to investigate the alleged breaches of the lease and to cancel it on the basis of his findings constitute breaches of fiduciary duty. Section 162.14 does not seem to us to require the Secretary to investigate exhaustively every violation of a lease alleged by an allottee. In addition, because section 162.14 gives the Secretary some discretion in fashioning a remedy when a lease has been shown to have been breached, one might well doubt that Brown can prevail on the merits of his claim. Indeed, it is not at all clear to us on the current record that Brown has stated a claim for which relief can be granted, i.e., that he has alleged the breach of a specific duty that the regulations squarely place on the Secretary. Cf. Pawnee, 830 F.2d at 191 (concluding that no valid claim had been stated where “the claim is simply that the Interior Department is compelled to go contrary to and beyond the [controlling] regulations and the leases in order to fulfill its alleged fiduciary obligation”). We think it the more prudent course, however, to leave this and other unanswered questions[12] for the trial court to determine in the first instance on remand.
Conclusion
Given the fact of the Secretary’s control over the entry into, substantive terms and form of, and exit from all commercial leases on allotted lands, we can only conclude that the Secretary acts as a fiduciary with respect to leases granted under 25 U.S.C. § 415(a). We therefore reverse the trial court’s dismissal of the instant breach of trust claim for lack of subject matter jurisdiction and remand the case for further proceedings consistent with this opinion.

Reversed and Remanded

Costs
Costs in favor of the appellants.

. Unless otherwise indicated, all statutory citations are to the 1994 edition of the United States Code.

. In 1964, section 415 provided, in relevant part, that "[a]ny restricted Indian lands, whether tribally or individually owned, may be leased by the Indian owners, with the approval of the Secretary of the Interior, for public, religious, educational, recreational, residential, or business purposes ... and all leases and renewals shall be made under such terms and regulations as may be prescribed by the Secretary of the Interior.” The regulations that governed leasing under the section at that time can be found at 25 C.F.R. part 131 (1966).

. A more detailed recitation of Lease B-45's troubled history can be found in the trial court's opinion. Brown v. United States, 32 Fed.Cl. 509, 511-12 (1994). We assume familiarity with it.

. The regulations implementing 25 U.S.C. § 415 were moved from part 131 to part 162 in 1982. 47 Fed.Reg. 13327 (1982). They have remained virtually unchanged since their promulgation in 1961. Compare 25 C.F.R. part 131 (1966) with 25 C.F.R. part 162 (1995).
Section 162.14 in particular empowers the Secretary to terminate a lease made under section 415 "[u]pon a showing satisfactory to the Secretary that there has been a violation of the lease or the regulations in this part.”

. Section 415(a), amended in 1970, Act of June 2, 1970, Pub.L. No. 91-275, 84 Stat. 303, now provides as follows:
Any restricted Indian lands, whether tribally or individually owned, may be leased by the Indian owners, with the approval of the Secretary of the Interior, for public, religious, educational, recreational, residential, or business purposes ... and all leases and renewals shall be made under such terms and regulations as may be prescribed by the Secretary of the Interior. Prior to approval of any lease or extension of an existing lease pursuant to this section, the Secretary of the Interior shall first satisfy himself that adequate consideration has been given to the relationship between the use of the leased lands and the use of neighboring lands; the height, quality, and safety of any structures or other facilities to be constructed on such lands; the availability of judicial forums for all criminal and civil causes arising on the leased lands; and the effect on the environment of the uses to which the leased lands will be subject.

. The trial court appears to have taken the Supreme Court's description of the clarity with which the government’s duties were established in Mitchell II as a prescription for determining *1560 whether a fiduciary duty exists in other domains. Brown, 32 Fed. Cl. at 514 (“In order to state a claim for money damages in this court, plaintiffs must demonstrate that 'the statutes and regulations at issue in this case clearly establish [the] fiduciary obligations of the Government in the management and operation of Indian lands ----'") (quoting United States v. Mitchell, 463 U.S. 206, 226, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983) (Mitchell II)).
This transformation of the descriptive into the prescriptive is improper and, to the extent that it guided the analysis, undermines the trial court’s conclusions respecting the existence of an enforceable fiduciary duty under section 415(a) and part 162.

. In Navajo Tribe of Indians v. United States, decided soon after Mitchell I, the Court of Claims rejected the government's contention that "no fiduciary obligation can arise unless there is an express provision of a treaty, agreement, executive order or statute creating such a trust relationship." 224 Ct.Cl. 171, 624 F.2d 981, 987 (1980) (emphasis in original).

. In Short v. United States, 719 F.2d 1133 (Fed. Cir.1983), cert. denied, 467 U.S. 1256, 104 S.Ct. 3545, 3546, 82 L.Ed.2d 849 (1984), decided less than four months after Mitchell II, we simply applied the jurisdictional holding of Mitchell II in another timber management case.

. The government actually presents a number of different formulations of what it believes to be the appropriate test: (1) “the basic question is whether or not the Secretary has such extensive management and control over Indian property so as to create a fiduciary duty enforceable in a suit for damages"; (2) whether there is “rather intense management” of the resource in question; and (3) "if the statutes and regulations require the Secretary to intensely manage the resource— particularly in an area such as oil and gas exploitation or timber management — that management permits an action for damages if the Secretary has breached a fiduciary duty ... [but] if the statutes and regulations rely on the allottees to manage their own land — with relatively light supervision by the Secretary — then no fiduciary duty enforceable in a suit for damages exists.”
All these formulations share two fundamental flaws. First, they improperly transform the disjunctive “control or supervision” test into a conjunctive "control and supervision” test. Second, they qualify the "supervision” aspect of the test by heaping on modifiers such as “rather intense” and “extensive” (while inexplicably excluding “relatively light supervision"), and qualify the “control” aspect with the modifier "extensive.”

. Section 177 provides, in relevant part, that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by trealy or convention entered into pursuant to the Constitution.” 25 U.S.C. § 177.

. It is worth noting that the combined effect of sections 348 and 415(a), even absent the additional controls over commercial leasing set forth in part 162, might well be sufficient to pass muster under the "control” portion of Mitchell II's "control or supervision" test. When we consider these statutes in conjunction with the regulatory controls before us, however, the result of our analysis is free from any doubt.

. The government’s motion to dismiss the instant case, in addition to raising the Mitchell II argument at the core of this appeal, asserted two other grounds for dismissal, both of which the trial court has yet to adjudicate: namely, the bar of the statute of limitations and failure to join a necessary and indispensable party. Brown, 32 Fed.Cl. at 510-11.