The SHOSHONE INDIAN TRIBE OF THE WIND RIVER RESERVATION, WYOMING, Plaintiff,

v.

The UNITED STATES, Defendant.

The Arapaho Indian Tribe of the Wind River Reservation, Wyoming, Plaintiff,

v.

The United States, Defendant.

Nos. 458A–79 L, 459A–79 L.

United States Court of Federal Claims.

June 6, 2002.

John C. Schumacher, Fort Washakie, WY, for plaintiff, The Shoshone Indian Tribe of the Wind River Reservation, Wyoming a/k/a Eastern Shoshone Tribe. Steven S. Rosenthal, Washington, DC, of counsel.

Timothy J. Judson, Denver, CO, for plaintiff, The Arapaho Indian Tribe of the Wind River Reservation, Wyoming a/k/a Northern Arapaho Tribe. David I.C. Thomson, Denver, CO, of counsel.

Stuart B. Schoenburg, with whom was Thomas L. Sansonetti, Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant. Stephen Simpson, Office of the Solicitor, Division of Indian Affairs, United States Department of the Interior, Washington, DC, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

This is an action by the Eastern Shoshone Tribe (the Shoshone) and the Northern Arapaho Tribe (the Arapaho) (collectively, the Tribes) for damages based on the United States' alleged breach of trust for mismanagement of the Tribes' natural resources up to the point of collection and with respect to defendant's handling of Tribal funds postcollection. *See generally* Eastern Shoshone and Northern Arapaho Tribes' Statement Regarding Sand and Gravel: Pits, Time Frames, Legal Theories and Factual Bases. The Tribes in this consolidated action share an undivided interest in the Wind River Indian Reservation (the Reservation) in Wyoming including, but not limited to, the mineral and other resources on and under the Reservation. *Id.* There are presently two separate dockets for these consolidated cases. The Tribes' sand and gravel claims are docketed as 79–458a L & 79–459a L (subdocket).[1] All of the Tribes' other claims are docketed as 79–458 L & 79–459 L (main docket). This Opinion and Order addresses pretrial motions on the sand and gravel claims.[2]

---

1. The subdocket claims (458a–79 L & 459a–79 L) are listed within the court's computer docketing system as 79–04581 & 79–04591.

2. The Tribes seek recovery for losses to and mismanagement of their trust property for the period 1946 to the present. *See* Petition filed October 10, 1979 at ¶¶ 10–11. Earlier in this litigation, defendant moved to limit the Tribes' recovery to a period beginning no earlier than October 10, 1973, that is, six years prior to the filing of the complaint in this action under this court's general statute of limitations, 28 U.S.C. § 2501(1994). *See* Defendant's Motion and Supporting Memorandum Re: Statute of Limitations Issues at 2 (Defendant's Statute of Limitations Motion). On November 30, 2001, the court denied Defendant's Statute of Limitations Motion. *See Shoshone Indian Tribe of Wind*

*River Reservation, Wyo. v. United States,* 51 Fed. Cl. 60, 61 (2001). The court held that the Tribes may seek recovery and present evidence at trial for the period beginning in 1946 because Congress, in passing a series of appropriations acts, deferred the accrual of Indian trust claims until an accounting of the Tribes' trust property is provided. *Id.* at 67.

The litigation in this case is currently divided into four phases for adjudication. The first phase, as to which trial will be held beginning June 24, 2002, involves the Tribes' mineral trespass claims, as well as other claims relating to specific sand and gravel pits on the Reservation. The second through fourth phases involve extraction issues relating primarily to royalty accounting for specific oil and gas deposits and certain trust money mismanagement claims. The litiga-

Before the court are motions and briefs[3] filed by the parties to focus the issues for trial of the Tribes' sand and gravel claims, including:

- Defendant's Motion to Dismiss Plaintiffs' Sand and Gravel Claims and Memorandum in Support (Def.'s Sand and Gravel Mot. or Defendant's Sand and Gravel Motion)
- Plaintiff Shoshone Indian Tribe of the Wind River Reservation's Opposition to Defendant's Motion to Dismiss the Tribes' Sand and Gravel Claims (Shoshone Tribe's Resp. or Shoshone Tribe's Response)
- Plaintiff the Arapaho Tribe of the Wind River Reservation's Response to Defendant's Motion to Dismiss Plaintiffs' Sand and Gravel Claims and Memorandum in Support (Arapaho Tribe's Resp. or Arapaho Tribe's Response)
- Defendant's Reply to Plaintiffs' Responses to Defendant's Motion to Dismiss Sand and Gravel Claims (Def.'s Reply or Defendant's Reply).
- Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment Denying as a Matter of Law Plaintiffs' Willful or Innocent Trespass Claim (Def.'s Trespass Mot. or Defendant's Trespass Motion)
- The Eastern Shoshone Tribe and Northern Arapaho Tribes' Cross–Motion for Summary Judgment and Response to the United States' Motion to Dismiss and Motion for Summary Judgment (Pls.' Trespass Cross–Mot. and Resp. or Plaintiffs' Trespass Cross–Motion and Response)
- Defendant's Response to Plaintiffs' Cross Motion for Summary Judgment and Reply to Plaintiffs' Response [to] Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment (Def.'s

Trespass Resp. and Reply or Defendant's Trespass Response and Reply)

The court has also considered Defendant's Proposed Findings of Uncontroverted Fact (Def.'s Facts or Defendant's Facts), the Eastern Shoshone and Northern Arapaho Tribes' Additional Proposed Findings of Uncontroverted Fact (Pls.' Facts or Plaintiffs' Facts), and the Exhibits to the Eastern Shoshone and Northern Arapaho Tribes' Additional Proposed Findings of Fact (Pls.' Exhibits or Plaintiffs' Exhibits) filed in connection with the summary judgment motions regarding the Tribes' trespass claims.

For the following reasons, Defendant's Sand and Gravel Motion is DENIED, Defendant's Trespass Motion is GRANTED in part and DENIED in part, and Plaintiffs' Trespass Cross–Motion is DENIED.

I. Background

The court ordered the Tribes to file, as part of the pretrial proceedings, a document "identifying the specific sand and gravel pits that are the subject of [their] claims, the time frames at issue in [their] claims, the legal theories supporting [their] claims, and the factual basis for [their] claims." Order of June 13, 2001 ¶ 6.[4] The Tribes submitted a statement regarding their sand and gravel claims on August 17, 2001. *See* Eastern Shoshone and Northern Arapaho Tribes' Statement Regarding Sand and Gravel: Pits, Time Frames, Legal Theories and Factual Bases (Pls.' Sand and Gravel Statement). Following the court's November 30, 2001 determination concerning the statute of limitations, the Tribes submitted a second statement regarding their sand and gravel claims on January 15, 2002. *See* Eastern Shoshone and Northern Arapaho Tribes' Second Statement Regarding Sand and Gravel Claims: Pits, Time Frames, Legal Theories and Factual Bases (Pls.' Second Sand and Gravel

---

tion is in various stages of discovery as to each of the phases.

**3.** The Tribes have generally submitted joint briefs in this action. However, the Tribes submitted separate responses to Defendant's Sand and Gravel Motion. Because the separate briefs are substantially consistent with each other, the court treats the Tribes collectively when referring

to these responses and generally cites to only one of the Tribes' briefs.

**4.** Prior to the Order of June 13, 2001, the Tribes submitted the Eastern Shoshone and Northern Arapaho Tribes' Statement Regarding Sand and Gravel: Pits, Time Frames, Legal Theories and Factual Bases (Pls.' Theories and Factual Bases or Plaintiffs' Theories and Factual Bases).

Statement). The Arapaho filed a supplemental statement regarding sand and gravel claims on March 15, 2002 (Arapaho Tribe's Sand and Gravel Statement Supp.) (collectively, "Sand and Gravel Statements"). The court has also considered Defendant's Responses to Plaintiffs' Second Statement and Northern Arapaho Tribe's Supplemental Statement on the Plaintiffs' Sand and Gravel Claims (Def.'s Resp. to Pls.' Second Sand and Gravel Statement) in ruling on the pending motions.

Plaintiffs' Second Sand and Gravel Statement lists the following as theories and bases of recovery:

- defendant failed to maximize the Tribes' best economic interests when issuing permits for removal of sand and gravel
- defendant failed to assess and collect required rental payments for sand and gravel
- defendant failed to require timely payment for sand and gravel removed or extracted
- defendant failed to include protections in permits, to monitor permits for violations, and to take action with respect to permit violations
- defendant breached its trust duty to prevent trespass of the Tribes' minerals
- defendant is directly liable for mineral trespass
- defendant is liable for a Fifth Amendment taking of sand and gravel for public purposes without just compensation
- defendant failed to provide for proper reclamation of the sand and gravel pits
- defendant is liable for interest
- defendant is liable for attorney fees
- defendant failed to deposit funds receipts from sand and gravel into the Tribes' accounts in a timely manner.

*See generally* Pls.' Second Sand and Gravel Statement. The Tribes allege that 4,825,632 cubic yards of sand and gravel were removed from the Tribes' pits between 1946 and the present. Pls.' Second Sand and Gravel Statement at 2.

The Tribes contend that the 1938 Indian Mineral Leasing Act (IMLA), 25 U.S.C. § 396a-g, the regulations implementing the IMLA, the treaties [5] and statutes specific to the Wind River Reservation, and the Indian trust decisions of this court, the Court of Appeals for the Federal Circuit, and the Supreme Court vest the United States with full fiduciary responsibility to maximize tribal profits originating from the Tribes' sand and gravel resources. *See* Shoshone Tribe's Resp. at 1; *see also* Pls.' Second Sand and Gravel Statement at 3–7, 16. Accordingly, the Tribes argue that defendant's trust responsibility over the Tribes' sand and gravel resources required defendant to follow the most exacting fiduciary standards for the management of these resources. Pls.' Second Sand and Gravel Statement at 5–6. The Tribes allege that defendant's failure to discharge effectively its trust responsibilities over the Tribes' sand and gravel resources, including defendant's failure to prevent mineral trespass, has resulted in significant revenue loss for the tribes as well as significant losses to their remaining sand and gravel reserves. *See* Pls.' Second Sand and Gravel Statement at 16–18.

Defendant moves to dismiss the Tribes' sand and gravel claims on the ground that Congress has not vested the United States with trust responsibility over the Tribes' sand and gravel resources. *See* Def.'s Sand and Gravel Mot. at 10. In a separate motion, defendant moves to dismiss the Tribes' willful or innocent trespass claims.

5. The Tribes rely on several treaties pertaining to the Wind River Reservation as well as the Trade and Intercourse Act, as amended, 25 U.S.C. § 177, for the proposition that the United States has a "fundamental trust responsibility over all components of tribal land," including its sand and gravel resources. *See, e.g.,* Arapaho Tribe's Resp. at 3. The Tribes cite no authority to support the argument that either the treaties or the Trade and Intercourse Act create a trust responsibility over Indian resource management claims thereby establishing an independent jurisdictional basis for this court to exercise jurisdiction over the Tribes' sand and gravel claims. Because the court holds that it has jurisdiction of these claims pursuant to statutes and regulations which apply directly to the Tribes' sand and gravel resources, it is unnecessary for the court to determine whether any of the treaties or the Trade and Intercourse Act might supply an independent basis for this court to exercise its jurisdiction in this matter.

After addressing legal standards generally applicable to both motions, the court addresses in turn Defendant's Sand and Gravel Motion and Defendant's Trespass Motion.

## II. Jurisdiction and Standard of Review

### A. Jurisdiction

The United States Court of Federal Claims has jurisdiction over the Tribes' claims pursuant to 28 U.S.C. § 1491 (2001) (the Tucker Act), and 28 U.S.C. § 1505 (1994) (the Indian Tucker Act). The Tucker Act and Indian Tucker Act waive the United States' sovereign immunity as to claims within their scope. *United States v. Mitchell,* 463 U.S. 206, 211–216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II* ). It is settled law that the United States is vested with a trust responsibility with respect to tribal monies or property "where the federal government takes on or has control or supervision over" such monies or property. *Id.* at 225, 103 S.Ct. 2961 (quoting *Navajo Tribe of Indians v. United States,* 224 Ct.Cl. 171, 624 F.2d 981, 987 (1980)).[6] In cases such as this one, where the Indian Tucker Act supplies a waiver of sovereign immunity, the underlying statutes and regulations relied on for jurisdiction "need not provide a second waiver of sovereign immunity ...." *Mitchell II,* 463 U.S. at 218–19, 103 S.Ct. 2961.

### B. Standard of Review

Defendant has moved to dismiss the Tribes' claims under Rule 12(b)(6)[7] of the United States Court of Federal Claims (RCFC) on the ground that the Tribes fail to state claims on which relief can be granted, and under Rule 12(b)(1) for lack of subject matter jurisdiction. Def.'s Sand and Gravel Mot. at 2. Dismissal under Rule 12(b)[ (6) ] is

appropriate "when the facts asserted by the plaintiff do not entitle him to a legal remedy." *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir.2000). The court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in [the nonmovant's] favor" when ruling on a motion to dismiss under Rule 12(b)[(6)]. *Id.* When ruling on a motion to dismiss under Rule 12(b)(1), however, the court may consider relevant evidence beyond the pleadings to decide the jurisdictional question if the jurisdictional facts in the complaint are disputed. *See Rocovich v. United States,* 933 F.2d 991, 993–94 (Fed.Cir.1991); *see also Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988) (citing *Land v. Dollar,* 330 U.S. 731, 735, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947)). Plaintiff has the burden of establishing jurisdictional facts. *See McNutt v. General Motors Corp.,* 298 U.S. 178, 188, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

Defendant has moved alternatively for summary judgment in Defendant's Sand and Gravel Motion and its Trespass Motion. In addition, the Tribes filed a cross-motion for summary judgment with respect to their trespass claims. Summary judgment is warranted when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

While defendant has styled its motions in the alternative, that is, as motions to dismiss, and in the alternative, motions for summary judgment, and the Tribes have cross-moved for summary judgment, the gravamen of the discussion contained in both parties' briefs is legal rather than factual in nature. The

---

**6.** *See also, e.g.,* 25 U.S.C. § 162a (d), which provides in part:

> The [Interior] Secretary's proper discharge of the trust responsibilities of the United States shall include (but are not limited to) the following:
> ....
> ... (6) Establishing consistent, written policies and procedures for trust fund management and accounting.
> ....

> (8) Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands.

25 U.S.C. § 162a (d)(6), (8) (2001).

**7.** This proceeding was brought and defendant's Motion to Dismiss was filed under Rules 12(b)(1) and 12(b)(4), prior to the amendments of the Rules of the Court of Federal Claims (RCFC), which became effective May 1, 2002. Those amendments, *inter alia,* renumbered subsections of Rule 12(b). In this opinion, the court refers to the subsections as renumbered.

court has considered all of the motions before it as motions to dismiss under the applicable standard of review. The motions for summary judgment are accordingly DENIED without prejudice to the filing by any party of a motion addressing any issue not decided in this Opinion and Order.[8]

### III. Defendant's Sand and Gravel Motion

■ The central issue raised by Defendant's Motion to Dismiss Plaintiffs' Sand and Gravel Claims is whether the federal statutes and regulations governing the management of the Tribes' sand and gravel resources impose on the United States full fiduciary responsibility over these resources, or whether the United States exercised a level of "control or supervision" over the Tribes sand and gravel resources sufficient to meet the "control or supervision" test established by *Mitchell II*, 463 U.S. at 218, 224–27, 103 S.Ct. 2961. If either the statutes and regulations or the control or supervision exercised by the government give rise to a money-mandating trust responsibility over the Tribes' sand and gravel resources, a trial can be conducted, and evidence heard, as to whether the United States breached that responsibility. Accordingly, the court begins by reviewing the control or supervision test contained in the Supreme Court's *Mitchell* decisions, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*Mitchell I* ) and *Mitchell II*.

#### A. *Mitchell I*

In *Mitchell I*, plaintiffs, Indian allottees (allottees), asserted a breach of trust claim against the United States for alleged mismanagement of the Indians' commercial timber resources. The allottees premised their claim on the Indian General Allotment Act of 1887(GAA), ch. 119, 24 Stat. 388, 25 U.S.C. § 331. Overruling a finding of breach of trust by the Court of Claims, the Supreme Court held that the GAA "created only a limited trust relationship between the United States and the allottees that does not impose any duty upon the Government to manage [the allottees'] timber resources." *Mitchell I*, 445 U.S. at 542, 100 S.Ct. 1349. The Supreme Court held that the GAA "does not

unambiguously provide that the United States has undertaken full fiduciary responsibilities as to management of allotted lands." *Id.*

In making its determination that the GAA did not impose trust responsibilities on the government, the Supreme Court considered the background and legislative history of the GAA:

> Furthermore, events surrounding and following the passage of the General Allotment Act indicate that the Act should not be read as authorizing, much less requiring, the Government to manage timber resources for the benefit of Indian Allottees.

*Id.* at 545, 100 S.Ct. 1349. The Court concluded that the GAA did not provide the allottees with a basis to recover money damages for the alleged mismanagement of the allottees' timber resources. *Id.* at 546, 100 S.Ct. 1349. The case was then remanded to determine whether the allottees could base their trust mismanagement claims on any other source of law that could be viewed as money-mandating. *Id.*

#### B. *Mitchell II*

On remand, the Court of Claims ruled that the plaintiffs had stated a money-mandating claim. The Court of Claims based its ruling on its finding that "the Department of the Interior ... exercises 'comprehensive' control over the harvesting of Indian timber" pursuant to a number of forestry management statutes and regulations. *Mitchell II*, 463 U.S. at 209, 103 S.Ct. 2961 (citations omitted). In its affirmance of the Court of Claims decision on remand, the Supreme Court also contrasted the government's statutory obligation to manage timber with government's lesser obligations under the GAA:

> In contrast to the bare trust created by the General Allotment Act, the statutes and regulations [regarding timber management] now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby es-

---

8. The court does not anticipate that it will delay     trial to address any such motion.

tablish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities.

*Mitchell II,* 463 U.S. at 224, 103 S.Ct. 2961.

In *Mitchell II,* the Supreme Court based its reasoning, in part, on general principles of trust law. The Court stated:

[A] fiduciary relationship necessarily arises when the government assumes such elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds). "[Where] the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection."

*Mitchell II,* 463 U.S. at 225, 103 S.Ct. 2961 (quoting *Navajo Tribe of Indians v. United States,* 224 Ct.Cl. 171, 624 F.2d 981, 987 (1980)).

### C. *Mitchell* and the Parties' Arguments

Defendant moves to dismiss the Tribes' sand and gravel claims on the grounds that "neither the 1916 Act and 25 C.F.R. Part 227, taken together, nor the 1938 Act [the IMLA] and [25 C.F.R] Part 211 [the implementing regulations for the IMLA], taken together, create[] a comprehensive statutory/regulatory scheme which is money-mandating with respect to the Tribes' sand and gravel resources" under the "control or supervision" test of *Mitchell II,* 463 U.S. at 218, 224–27, 103 S.Ct. 2961. Def.'s Sand and Gravel Mot. at 5. Defendant argues that this court does not have jurisdiction over the Tribes' claims because the statutes and regulations in question do not create a comprehensive statutory and regulatory scheme that is money-mandating under the *Mitchell II* standard.

Defendant correctly interprets *Mitchell II* as requiring the court to examine " 'whether the source of substantive law [relied on by the Tribes] can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained ... as a result of the breach of the duties they impose.' " Def.'s Sand and Gravel Motion at 8 (quoting *Mitchell II,* 463 U.S. at 219, 103 S.Ct. 2961). In this regard, defendant argues that "[a]pplying *Mitchell I* and *Mitchell II* .... to sand and gravel on the Wind River Reservation, it is clear that there does not exist a comprehensive statutory/regulatory scheme which mandates that the sand and gravel resources held in trust for the plaintiff Tribes are to be managed so as to generate income therefrom for the benefit of the Tribes." Def.'s Sand and Gravel Mot. at 10.

In support of its argument, defendant quotes the following language from the *Mitchell II* decision, which defendant ends in an ellipsis:

Where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists ....

Def.'s Sand and Gravel Mot. at 9 (citing *Mitchell II,* 463 U.S. at 225, 103 S.Ct. 2961). The following language is what defendant omitted from the above quotation:

[a fiduciary relationship normally exists] (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.

*Mitchell II,* 463 U.S. at 225, 103 S.Ct. 2961. The quotation, when set out in full, expresses the Supreme Court's view that the expression of a trust responsibility in the language of a statute is not the only basis for a finding of adequate control or supervision to give rise to a trust or fiduciary responsibility. *Mitchell II* also contemplates an inquiry into the level of control that the United States exercises over the Indian resources in question. Defendant's characterization of the *Mitchell II* control or supervision test overlooks the point that actual control or supervision by the government with respect to the Indians' resources may provide an independent basis for fiduciary responsibility in the

absence of a clear statutory or regulatory directive prohibiting such a conclusion. *Mitchell II,* 463 U.S. at 225, 103 S.Ct. 2961 (instructing that "unless Congress has provided otherwise ... control or supervision over tribal monies or properties ... normally" supports a finding that "the fiduciary relationship ... exists ... even though nothing is said expressly in the authorizing or underlying statute"); *see also White Mountain Apache Tribe v. United States,* 249 F.3d at 1364, 1375 (2001) *rehearing en banc denied, cert. granted,* — U.S. —, 122 S.Ct. 1604, 152 L.Ed.2d 619 (2002) (stating that "the language of *Mitchell II* makes quite clear that control alone is sufficient to create a fiduciary relationship").

The Tribes urge a broad reading of the *Mitchell* cases. The Tribes' assertion that "[s]tatutes or regulations that *allow* for the Government's 'control or supervision' over Indian ... resources ... create a fiduciary relationship between the parties" appears to the court to stretch *Mitchell* beyond what can be found in the Supreme Court's opinion. Arapaho Tribe's Resp. at 6 (citing *Mitchell II,* 463 U.S. at 225, 103 S.Ct. 2961) (emphasis added). Neither the language in *Mitchell II,* nor the recent Federal Circuit precedent interpreting the *Mitchell II* control or supervision test, supports the Tribes' position that a statute or regulation that merely "allows" for federal control can, without more, impose a money-mandating trust responsibility on the United States. *See, e.g., Navajo Nation v. United States,* 263 F.3d 1325, 1328–1331 (2001); *see also White Mountain Apache Tribe,* 249 F.3d 1364, 1373–1377.

The court believes, however, that the Tribes properly rely on *Brown v. United States,* 86 F.3d 1554 (Fed.Cir.1996), in arguing that the statutes and regulation in question need not unambiguously provide for federal control where the government actually takes control over the Tribes' resources. According to the Tribes, *Brown* stands for the proposition that the statutes and regulations in question need not by their terms impose "ongoing management responsibility over the day-to[-]day administration of [the resource in question]" (in *Brown,* the lease of land used as a golf course) in order for the government to be vested with a full trust respon-

sibility. *See* Arapaho Tribe's Resp. at 7 (quoting *Brown,* 86 F.3d at 1561).

The Tribes argue that under *Brown,* actual federal control or supervision over the Tribes' sand and gravel resources is all that is needed to provide a substantive right to sue for money damages. *See* Shoshone Tribe's Resp. at 18. The Tribes also argue that under *Brown,* the "proper test of whether the United States has assumed fiduciary duties under applicable regulations and statutes is whether the Secretary, rather than the allottees, has 'control' *or* 'supervision' over the lease." *Id.* at 17. The Tribes' analogize the regulatory scheme in this case to that in *Brown* because, in both cases, the leasing (or permitting) of the resource (in *Brown,* land, and in this case, minerals) is retained by the Secretary of the Interior, and is administered using the Secretary's forms. *See* Shoshone Tribe's Resp. at 17–18 (citing *Brown,* 86 F.3d at 1561–62); *See, e.g.,* Pls.' Exhibits 46, 47 (providing examples of the Bureau of Indian Affairs' mineral permit forms used on the Wind River Reservation).

According to the Tribes, the Indian Mineral Leasing Act of 1938, 25 U.S.C. § 396a-g (IMLA) affords the Tribes a substantive right to sue the defendant for money damages for the United States' breach of their trust responsibilities under the test control or supervision test in *Mitchell II.* Shoshone Tribe's Resp. at 1. The Tribes rely on *Navajo Nation,* 263 F.3d at 1331, for the proposition that the IMLA and its implementing regulations "assign to the Secretary of the Interior and other government officials the authorization, supervision, and control of Indian mineral leasing activities." The Tribes point out that the Court of Appeals held in *Navajo* that the "IMLA was directly analogous to the timber regulations at issue in *Mitchell II.*" Arapaho Tribe's Resp. at 12. The Tribes quote the following language from Federal Circuit's *Navajo* decision to support their argument that the IMLA imposes a money-mandating trust responsibility on the United States with respect to their mineral resources:

The statute and its implementing regulations give the Secretary the final authority

on *all matters of any significance in the leasing of Indian lands for mineral development.* The statute assigns to the Secretary the broad and unqualified obligation to "protect [ ] the interests of the Indians," and includes the power to "perform any and all acts and to make sure such rules and regulations not inconsistent with this section as may be necessary and proper for the protection of the interests of the Indians and for the purpose of carrying the provisions of this section into full force and effect." 25 U.S.C. § 399. Thus *the statute explicitly requires that the Secretary must act in the best interest of the Indian tribes.*

Arapaho Tribe's Resp. at 12–13 (quoting *Navajo*, 263 F.3d at 1330–31) (emphasis in original); Shoshone Tribe's Resp. at 25–26.

Given the *Navajo* decision, defendant's contention—that the statutes and regulations implicated by the Tribes' sand and gravel claims are analogous to those in *Mitchell I* and, therefore, impose only a "bare" trust relationship over these resources and are not money-mandating—is problematic. *See* Def.'s Resp. to Pls.' Second Sand and Gravel Statement at 5; Def.'s Sand and Gravel Mot. at 5.

Defendant urges that the IMLA is inapplicable for several reasons, based largely on aspects of the IMLA's implementing regulations contained in 25 C.F.R. Part 211 (2001). Defendant suggests that 25 C.F.R. Part 211 "by its terms, does not apply to the Wind River Reservation, and can impose no duty on the Secretary of the Interior to 'manage' plaintiffs' ... sand and gravel resources or to give the Secretary 'control' of plaintiffs' sand and gravel resources," *see* Def. Sand and Gravel Mot. at 12, because Section 211.1(e) contains the following non-applicability provision:

> (e) The regulations in this part do not apply to leasing and development governed by regulations in 25 CFR parts ... 227 ( [the] Wind River Reservation).

Def.'s Sand and Gravel Mot. at 12–14; 25 C.F.R. § 211.1(e) (2001).

The Tribes reply, correctly, that 25 C.F.R. Part 227, referenced in the non-applicability provision quoted above, applies only to the extraction of oil and gas on the Reservation. What the non-applicability provision does is forestall any confusion in scope between the IMLA regulations in 25 C.F.R. Part 211 and the oil and gas regulations in 25 C.F.R. Part 227. The non-applicability provision does not exempt sand and gravel resources from coverage under 25 C.F.R. Part 211 or the IMLA. *See* 25 C.F.R. § 211.1(e) (2001) (explaining that the regulations in Part 211 do not apply to leasing and development governed by oil and gas regulations found in 25 C.F.R. Part 227 (Wind River Reservation)).

The Tribes also point out that 25 C.F.R. § 211.3 explicitly defines sand and gravel as a mineral subject to Part 211:

> *Minerals* includes both metalliferous and non-metalliferous minerals ... and includes but is not limited to, sand, gravel ... or any other energy or non-energy mineral.

Shoshone Tribe's Resp. at 30 (citing 25 C.F.R. § 211.3).

Defendant argues that the inclusion of sand and gravel in the definition of the term "mineral" in 25 C.F.R. § 211.3 did not occur until 1996, Def.'s Reply at 5 (citing 61 Fed. Reg. 35634 (July 8, 1996)), and therefore cannot provide a jurisdictional basis for the Tribes' sand and gravel claims predating 1996. *See* Def.'s Reply at 5 (citing 3 Fed. Reg. 1429 (June 17, 1938)). Defendant argues that the 1996 amendment of Part 211 substantively changed the scope of the regulations such that before 1996, sand and gravel was not a "mineral" within the coverage of the IMLA and its implementing regulations. Def. Reply at 5. It is true generally that an amendment to a statute or a regulation creates a "presumption of change" thereby "creating a new right ...." *See* 1A Norman J. Singer, *Sutherland Statutory Construction* (6th ed. 2002) (Sutherland) § 22.30, at 357–58.[9] Despite this presumption, "legislative history may indicate that the amendment

---

9. "[R]egulations [are] frequently used as guides in determining the meaning of statutory provi-

sions ...." Sutherland § 31.6, at 722.

was intended as a clarification." *Id.* at 366. In this case the legislative history indicates that sand and gravel was within the coverage of the IMLA from the date of its original enactment, and that the 1996 amendment to 25 C.F.R. Part 211 was merely a clarification.

The Tribes quote from the following legislative history to support their argument that Congress intended, through the passage of the IMLA, to supervise and control sand and gravel exploration and removal on Indian land:

> The most urgent change is in the interest of leasing deposits of building stone, sand and gravel, and metalliferous minerals.

Arapaho Tribe's Resp. at 15 (quoting Letter to the Speaker of the House of Representatives of June 17, 1937, from Charles West, Acting Secretary of the Interior (West letter)). As the Tribes point out, then-Secretary West was expressing his concern that the current mining law was unorganized and needed to be updated, especially with respect to "requests for leases for the purpose of removing sand and gravel ...." *Id.* The Tribes argue that the West letter specifically "express[es] concern that the lands containing sand and gravel deposits, which could be utilized for the profit of the Indian landowners, are being passed over due to the cumbersome nature of the [then] governing mining law." *Id.* To the extent that there is ambiguity imported into the statute by the regulations, the court finds support in the legislative history for the Tribes' position that the IMLA was intended to cover and did cover sand and gravel upon its enactment.[10]

Defendant also marshals a distinction between "leases" and "permits" in the "Definitions" section of 25 C.F.R. Part 211, § 211.3

in support of its argument that defendant owes no duty to the Tribes with respect to sand and gravel:

> Lease means any contract approved by the United States under the Act of May 11, 1938 ..., that authorizes exploration for, extraction of, or removal of any minerals.
>
> ....
>
> Permit means any contract issued by the superintendent and/or area director to conduct exploration on; or removal of less than 5,000 cubic yards per year of common varieties of minerals from Indian Lands.

*See* Def.'s Sand and Gravel Mot. at 13 n. 8 (quoting 25 C.F.R. § 211.3). Defendant argues that Part 211 does not contemplate that sand and gravel would be managed pursuant to the IMLA because sand and gravel is a common variety of mineral, the usage of which is pursuant to permits, not leases. *Id.* Relying on the trial court's reasoning in *Navajo Nation v. United States*, 46 Fed.Cl. 217 (2000), *rev'd* 263 F.3d 1325 (Fed.Cir.2001), defendant argues that, because the permitting system provides for far less control over tribal resources than the leasing system, Part 211 cannot give rise to jurisdiction under the *Mitchell II* standard. *See* Def.'s Reply at 7–8.

The Tribes argue that the distinction between leases and permits is without legal significance and also that, to the degree that there is a difference between a lease and a permit, the fact that sand and gravel was mined under permits on the Reservation itself constituted a breach of the defendant's duty to the Tribes. *See* Shoshone Tribe's Resp. at 31. In this regard, the Tribes allege, without citing to documentation presently in the record, that every single permit

---

**10.** The West letter cited by the Tribes is appended to the House Report and Senate Report accompanying the IMLA. *See* S.Rep. No. 985 (1937) (the Senate Report); H.R.Rep. No. 1872 (1938) (collectively, the Reports). In fact, the Reports consist almost entirely of the West letter. In the case of the Senate Report, an introductory paragraph authored by Senator Thomas of Oklahoma of the Committee on Indian Affairs recommends that the bill "pass without amendment," and states that the "committee authorized the introduction of the bill ... for the purpose of carrying out the wishes of the Secretary of the Interior [Mr. West]." Sen. Rep. 985 at 1. Senator

Thomas concluded, "[The] communication of the Secretary of the Interior, dated July 17, 1937 ... is attached hereto and made a part of this report ...." Based on the endorsement by Senator Thomas and its inclusion in the Reports, the court views the West letter as evidence of the intent of Congress when it passed the IMLA. *See Negonsott v. Samuels*, 507 U.S. 99, 106–07, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993) (finding that a letter written by the Secretary of the Interior, reproduced in both a Senate Report and a House Report, which consisted "almost entirely" of the letter, serves as legislative history expressing the intent of Congress).

issued for sand and gravel on the Reservation has been in excess of 5,000 yards per year (which, if correct, would appear to be inconsistent with the regulatory scheme). *See id.* The Tribes argue, therefore, that the United States has breached its trust responsibility with respect to the Tribes' sand and gravel resources by failing to follow its own regulations. *Id.* Because the foregoing contentions involve factual allegations, the court expects that this issue will be raised by the Tribes at trial.

The parties do not argue the distinction that a permit is a contract "issued by the superintendent" while a lease is a contract "approved by the United States." *See* 25 C.F.R. § 211.3. Whatever the difference between "issued by" and "approved by," the difference would not, in the court's view, be likely to support the argument that permits are somehow not under the "control or supervision" of defendant. Furthermore, under *Mitchell II,* Congress has not "provided otherwise" with respect to permits, that is, Congress has not excluded permits from the control or supervision over Indian mineral resources mandated throughout 25 C.F.R. Part 211. Under other provisions of Part 211, leases and permits are controlled by the United States in similar ways. *See, e.g.,* 25 C.F.R. § 211.54 (treating leases and permits identically).

### D. The Tribes Have Stated a Claim for Breach of Trust Because Defendant Exercised Control or Supervision Sufficient to Provide Jurisdiction

The Court of Appeals for the Federal Circuit in *Navajo Nation* recently held that the IMLA imposes on the United States sufficient control or supervision under *Mitchell II* to provide this court with jurisdiction over the Tribes' mineral claims. *See Navajo Nation,* 263 F.3d at 1331 (holding that "[i]t is quite clear that the statute and regulations [the IMLA and 25 C.F.R. Part 211] assign to the ... government ... the authorization, supervision, and control of Indian mineral leasing activities .... leav[ing] no significant authority in the hands of the Indian tribes.").

The Court of Appeals in *Navajo* viewed the IMLA as an exercise of "pervasive control":

> Throughout the statute and its implementing regulations is seen the *pervasive control* by the United States of the manner in which mineral leases are sought, negotiated, conditioned, and paid, and the pervasive obligation to protect the interests of the Indian tribes.

263 F.3d at 1331 (emphasis added). *Navajo* also provided that the difference between a limited trust relationship in which the government does not have a money-mandating fiduciary duty to protect the interests of the Indians and a full fiduciary duty toward the Indians is determined by asking whether control of resources is in the hands of the Indians or in the hands of the government. 263 F.3d at 1328–29. In the latter case, a "full fiduciary relationship" is created. *Id.* at 1329. The Federal Circuit went on to state that "[t]he Indian Mineral Leasing Act and its regulations are similar to those governing timber resources that were the subject of *Mitchell II,* insofar as federal authority is retained." *Id.* at 1330.

The court also notes that the regulatory intent of 25 C.F.R. § 211.1 is clear. The regulation states:

> These regulations are intended to ensure that Indian mineral owners ... are assured that they will be developed in a manner that maximizes their best economic interests ....

25 C.F.R. § 211.1 (2001).

Defendant's argument that the control exercised by the United States over permits is less than the control required for the administration of leases is not consistent with the language of the regulations. The plain language of the regulations leaves little doubt that the United States was to administer permits as well as leases in a manner that ensures the Indians the best economic return for their mineral resources:

> *In the best interest of the Indian mineral owner* refers to the standards to be applied by the Secretary in considering whether to take an administrative action .... In considering whether it is "in the best interests of the Indian mineral owner" to take a

certain action (such as approval of a lease, permit, unitization or communitization agreement), the Secretary shall consider any relevant factor, including, but not limited to: economic considerations . . . .

25 C.F.R. § 211.3 (2001).

*Mitchell II* specifically held that a fiduciary relationship exists " '[where] the Federal Government takes on or has control or supervision over tribal monies or properties . . . even though nothing is said expressly in the authorizing or underlying statute . . . about a trust or fiduciary connection.' " 463 U.S. at 225, 103 S.Ct. 2961 (quoting *Navajo Tribe of Indians*, 624 F.2d at 987). The Tribes' sand and gravel claims as stated fall within the *Mitchell II* test.

For the foregoing reasons, this court has jurisdiction over the Tribes' sand and gravel claims. The court now turns to Defendant's Trespass Motion and Plaintiffs' Trespass Cross–Motion.

## IV. Defendant's Trespass Motion and Plaintiffs' Trespass Cross–Motion

### A. The Dispute

The Tribes contend that defendant breached its trust obligation to prevent mineral trespass under several interrelated sections of the Code of Federal Regulations, particularly, 25 C.F.R. Part 211 and 43 C.F.R. Parts 3590 and 9230. Section 9239.0–7[11] of 43 C.F.R. provides:

The extraction, severance, injury, or removal of timber or mineral materials *from public lands under the jurisdiction of the Department of the Interior,* except when authorized by law and the regulations of the Department, is an act of trespass. Trespassers will be liable for damages to the United States, and will be subject to prosecution for such unlawful acts.

43 C.F.R. § 9239.0–7 (2001) (emphasis added).

Despite the fact that § 9239.0–7 makes no mention of Indian lands, the Tribes argue that 43 C.F.R. § 9239.0–7 is applicable to the

Wind River Reservation under 43 C.F.R. § 3590.2(i). Pls.' Second Sand and Gravel Statement at 31. The Tribes contend that under *Mitchell II,* Section 3590.2(i) of 43 C.F.R. not only imposes a duty on the United States to prevent mineral trespass on the Reservation, but also provides the measure of damages that are payable to the Tribes for defendant's failure to carry out that duty. Pls.' Trespass Cross–Mot. and Resp. at 3–4.

Section 3590.2(i) of 43 C.F.R. describes the duties as to mineral trespass of the "authorized officer" of the various responsible agencies within the Department of the Interior, in part, as follows:

The authorized officer shall regulate prospecting, exploration, testing, development, mining, processing operations, and reclamation authorized under this part. The duties of the authorized officer include . . .

(i) Acting on any mineral trespass on Federal or Indian lands in accordance with part 9230 of this title.

43 C.F.R. § 3590.2(i) (2001).

The Tribes argue that 43 C.F.R. § 3590 is applicable to Wind River Reservation pursuant to 25 C.F.R. § 211.4, which, in describing how the Department of the Interior's duties under the IMLA will be discharged, provides, "The functions of the Bureau of Land Management are found in . . . 43 C.F.R. part 3590–Solid Minerals (other than coal) Exploration and Mining Operations." 25 C.F.R. § 211.4 (2001).

The Tribes assert that "[b]reach of trust [in this case] is established by the complete absence of any records evidencing any federal efforts to prevent or abate known mineral trespass activity, except for one instance[12] when the Tribes insisted." Pls.' Second Sand and Gravel Statement at 32. In that instance, defendant did bring an enforcement action in which the Tribes intervened. *Id.; see United States v. Gilpatrick Const. Co.,* Civ. No. C 80–0231 (D.Wyo.1980); Pls.' Trespass Cross–Mot. and Resp. at 11. The Tribes assert that, except for the *Gilpatrick* case, defendant has failed to prevent mineral

---

11. 43 C.F.R. § 9239.0–7 appears in 43 C.F.R. Part 9230.

12. See Pls.' Trespass Cross–Mot. and Resp. at 31–33 (citing *United States v. Gilpatrick Constr. Co.,* Civ. No. C 80–0231 (D.Wyo.1980)).

trespass, despite knowledge of its responsibility to do so, both with respect to unknown trespassers on unpermitted areas as well as with respect to unauthorized removal of sand and under existing leases and permits. Pls.' Second Sand and Gravel Statement at 32–33. The Tribes also argue that the United States has been complicit in instances of known mineral trespasses and is, therefore, liable for its acquiescence. *See id.* at 33–35.[13]

Defendant moves to dismiss the Tribes' trespass claims on several grounds: that the claims constitute special damages that were not pleaded in a timely manner under RCFC 9(g); that the claims sound in tort and are therefore beyond the jurisdiction on the court; and that the United States cannot be liable for trespass on property to which it holds title. Def.'s Trespass Mot. at 1.

### B. The Tribes' Mineral Trespass Claims Are Not Barred by Rule 9(g)

Defendant argues that the Tribes' willful trespass claim is untimely because it was not pleaded pursuant to the requirements of RCFC 9(g). *See* Def.'s Trespass Mot. at 2. Rule 9(g) requires:

> When items of special damage are claimed, they shall be specifically stated.[14]

According to defendant, "Neither the Tribes' complaints nor the Tribes' Submission of the Legal Basis for the Tribes' Theories of Recovery for Breach of Trust filed in August of 2000, gave Defendant reasonable notice of this new theory of damages based on trespass." *Id.* Defendant states that it has "understood that the extent of the relief being sought for the sand and gravel removed from BOR surface owned pits was the royalty lost to the Tribes … [under] 25 C.F.R. § 211.43(a) (formerly at 25 C.F.R. § 211.15(a)) or the standard permit amount, typically $1.00 per cubic yard." Def.'s Trespass Mot. at 3. Defendant asserts that it is

surprised that the Tribes now claim that "[they] are entitled to the *full value [of lost sand and gravel] without deduction for labor or expenses* brought up to today's value." Def.'s Trespass Mot. at 3 (quoting Pls.' First Sand and Gravel Statement at 21). According to defendant, because damages "far exceed[ ] recovery of the royalties the Tribes stood to have received if the removal had been undertaken pursuant to a sand and gravel permit, therefore, the Tribes are requesting 'special damages.'" *Id.*

Defendant argues that special damages must be pleaded in two classes of · cases:

> In the first, special damages sought are in addition to the general damages the law normally awards to compensate plaintiff for the injury he seeks to have redressed. In this class of cases, the purpose of requiring that special damages be specifically pleaded is to protect defendant against being surprised at trial by the extent and character of plaintiff's claim. A specific statement of special damages in the complaint will put defendant on notice and permit him to employ the discovery procedures to maximum advantage in preparing his defense to the claim for special damages.

Def.'s Trespass Mot. at 2–3 (citing and quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1310, at 701–02 (2d ed. 1990) (5 Wright & Miller)). Defendant asserts that this case is within the first class of cases. *Id.*[15]

The Tribes respond that damages for mineral trespass are not "special damages" within the coverage of Rule 9(g). *See* Pls.' Trespass Cross–Mot. and Resp. at 6–7. According to the Tribes, the relief they seek for their mineral trespass claims is appropriate because "[d]amages that the law presumes follow from the type of wrong com-

---

**13.** The *Gilpatrick* matter was brought to the court's attention in Plaintiffs' Trespass Cross–Motion and Response at pages 11, 31–32. Defendant does not appear to dispute the facts asserted by the Tribes with regard to *Gilpatrick*.

**14.** Rule 9(g) was not affected by the amendments to the court's rules effective May 1, 2002. *See supra* note 7.

**15.** "In the second class of cases, the existence of special damages is an essential ingredient of plaintiff's claims for relief; as a matter of substantive law he cannot recover without demonstrating that he sustained such damages." 5 Wright & Miller at 702 (listing defamation and disparagement of property as examples of this second class of cases).

plained of." *See id.* (citing Black's Law Dictionary 395 (7th ed.1999)). The Tribes insist that they are seeking only general damages because the trespass regulations in 43 C.F.R. § 9239.0–8 and 9239.5 themselves provide "an affirmative statement of ... [the] damages" they seek. Pls.' Trespass Cross Mot. and Resp. at 7. The Tribes claim that these damages are what the law normally awards for the injury complained of. *Id.*

■■■ Although defendant's argument is not without force, the court must evaluate the argument based on the particular circumstances of this case. Since the action was first filed in 1979, the parties' and the court's understanding of the facts and legal bases of the Tribes' claims has evolved as discovery has progressed and hearings have been held. The Tribes filed the now-disputed Sand and Gravel Statement as part of a joint pretrial effort to identify and focus the issues in this matter as the parties approach trial on the merits. *See* Order of June 13, 2001 (directing that the Tribes file a statement identifying their sand and gravel claims). Rule 9(g) is satisfied if the complaint adequately notifies the defendant and the court of the nature of the claimed damages in order to avoid surprise. *See Great American Indem. Co. v. Brown,* 307 F.2d 306, 308–09 (5th Cir.1962) (quoting *Olson v. Shinnihon Kisen K.K.,* 25 F.R.D. 7, 9 (E.D.Pa.1960) for the proposition that "once the issues are settled in pre-trial proceedings and by a pre-trial order, the case shall go to trial on the issues there determined, except of course to prevent manifest injustice, not here present"). Because the Tribes' complaint and Sand and Gravel Statements served to inform the court and the defendant of the nature of the damages sought, the court declines to grant Defendant's Trespass Motion on the grounds that the Tribes have violated RCFC 9(g).

C. The Tribes' Mineral Trespass Claims Are Not Barred as Claims in Tort

■■ Defendant also argues that the "gravamen of Plaintiffs' new [mineral trespass] claims sounds in tort, i.e., that officials of the United States have committed unauthorized willful trespass of sand and gravel which

belonged to the Plaintiff Tribes, purportedly triggering the penalty provisions of 43 C.F.R. Part 9230." Def.'s Trespass Mot. at 4; *see also* Def.'s Trespass Resp. at 6. While noting that the Indian Tucker Act, 28 U.S.C. § 1505, does not contain the language prohibiting this court from hearing tort-oriented cases that is contained in the Tucker Act, 28 U.S.C. § 1491, defendant asserts that this court lacks jurisdiction to entertain claims that sound in tort, under both the Tucker Act and the Indian Tucker Act, 28 U.S.C. § 1505. Def.'s Trespass Resp. at 3–5.

The Tucker Act provides:

The United States Court of Federal Claims shall have jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases *not sounding in tort.*"

28 U.S.C. § 1491 (2001) (emphasis added).

The Indian Tucker Act provides:

The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

28 U.S.C. § 1505 (1994).

The Tribes respond that the omission of the language "not sounding in tort" is "[s]ignificant[ ]." Pls.' Trespass Cross Mot. and Resp. at 2. According to the Tribes, the court has jurisdiction over the Tribes' mineral trespass claims under the Tucker Act and the Indian Tucker Act and, specifically, under the Indian Mineral Leasing Act of 1938 (IMLA), 25 U.S.C. § 396a-g, which vests the defendant with a trust responsibility over the

Tribes' sand and gravel. *See* Pls.' Trespass Cross–Mot. and Resp. at 2–3 (citing *Mitchell II*). According to the Tribes, their mineral trespass claim arises directly under 25 C.F.R. § 211 (the implementing regulations to the IMLA) and 43 C.F.R. Parts 3590 and 9230. *Id.*

The Court need not resolve the dispute about whether tort jurisdiction is inside or outside of the Indian Tucker Act. The regulations relied on by plaintiff for its trespass claims, in conjunction with the statutory framework relied on more generally for the Tribes' sand and gravel claims, support the Tribes' contention that the United States has assumed "elaborate control over" the Tribes sand and gravel resources sufficient to satisfy the control or supervision test contained in *Mitchell II*, 463 U.S. at 225, 103 S.Ct. 2961. Pursuant to its control and supervision, the United States had trust responsibility to protect the Tribes' mineral estate. Included in this trust responsibility is the duty to prevent mineral trespass. *See, e.g.,* 43 C.F.R. § 3590.2(i) ("The duties of the authorized officer include . . . (i)[a]cting on any mineral trespass on Federal or Indian lands in accordance with Part 9230 of this title . . . .").[16]

### D. The Tribes May Not Seek Damages Afforded to the United States by 43 C.F.R. Part 9230

■ While defendant concedes that the purpose of 43 C.F.R. Parts 3590 and 9230 is to address trespass on Indian lands, Def.'s Trespass Resp. and Reply at 12, defendant argues that the penalty provisions in these regulations apply only to third parties and not against the United States. *See* Def.'s Trespass Resp. and Reply at 12–13. Defendant points out that no court has found jurisdiction over a trespass claim against the United States. *Id.* at 13.

The Tribes contend that the mineral trespass regulations establish a proper measure of the damages to which they are entitled for their mineral trespass claims. *See* Pls.' Second Sand and Gravel Statement at 35. According to the Tribes, "It would be unconscionable to award the Tribes less in damages for the United States' failure to prevent or take action for mineral trespass than the United States collects in cases of mineral trespass brought on its own behalf, especially when the United States has some culpability in the process." *Id.*

Whether the result is unconscionable or not, there is nothing in the trespass regulations cited by the Tribes which suggests that the United States could be subject to and the Tribes could be entitled to receive the penalties provided for in 43 C.F.R. § 9230. The plain language of the regulation makes trespassers liable to the United States. The regulations state:

> Trespassers will be liable for damages *to the United States,* and will be subject to prosecution for such unlawful acts.

43 C.F.R. § 9239.0–7 (2001) (emphasis added). These regulations are only applicable to Indian Lands in that they are part of a regulatory framework which impose a duty on the United States to protect the Tribes' mineral estate. Any failure of the United States to prevent mineral trespass, if proven at trial, would be compensable as damages for breach of trust under *Mitchell II.*

The issue for trial is whether the United States acting as a trustee took appropriate measures to carry out its fiduciary responsibility to prevent mineral trespass. The regulations specifically provide that the United States is to safeguard tribes from mineral trespass, thereby creating a full trust responsibility pursuant to the control or supervision test contained in *Mitchell II.*

---

**16.** Defendant also argues that it did not breach its trust responsibilities by failing to prosecute known mineral trespassers. Def.'s Trespass Resp. and Reply at 15. Defendant cites *Creek Nation v. United States,* 318 U.S. 629, 639, 63 S.Ct. 784, 87 L.Ed. 1046 (1943) and *Shoshone–Bannock Tribes v. Reno,* 56 F.3d 1476, 1479–84 (D.C.Cir.1995) for the proposition that the United States has no general trust responsibility to pros- ecute on behalf of the Tribes on account of its prosecutorial discretion. *Id.* Defendant's argument confuses the issue of the government's alleged failure as a trustee with its exercise of prosecutorial discretion. The fact that the government has discretion about prosecution has no bearing on whether or not it has acted properly as a trustee. A trustee has no discretion to ignore its trust responsibilities.

## V. Conclusion

For the foregoing reasons, Defendant's Sand and Gravel Motion is DENIED; Defendant's Trespass Motion is GRANTED to the extent that Defendant will not be subject to the penalty provisions of 43 C.F.R. Part 9230 for any failure found on the part of the defendant to prevent mineral trespass on the Reservation and is otherwise DENIED; and Plaintiffs' Trespass Cross–Motion is DENIED.

**IT IS SO ORDERED.**